**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 8, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UTAH REPUBLICAN PARTY,

     Plaintiff - Appellant,

and

UTAH DEMOCRATIC PARTY,

     Plaintiff Intervenor,

v.

SPENCER J. COX, in his official capacity
as Lieutenant Governor of Utah,

     Defendant - Appellee.

_____

UTAH REPUBLICAN PARTY,

     Plaintiff,

and

UTAH DEMOCRATIC PARTY,

     Intervenor Plaintiff - Appellant,

No. 16-4091
(D.C. No. 2:16-CV-00038-DN)
(D. Utah)

v.

SPENCER J. COX, in his official capacity as Lieutenant Governor of Utah,

    Defendant - Appellee.

No. 16-4098
(D.C. No. 2:16-CV-00038-DN)
(D. Utah)

_____

**ORDER**
_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **LUCERO**, Circuit Judges.
_____

These matters are before the court on the *Utah Republican Party's Petition for Rehearing or Rehearing En Banc.* We also have a response from the appellee and, per the court's order dated May 30, 2018, a reply in support. In addition, we have also considered the amicus curiae brief of the Institute for Free Speech and we direct the clerk to file that brief formally effective the date of this order. *See* 10th Cir. R. 29.1.

Upon consideration of all the materials, the request for panel rehearing is denied. A panel majority has, however, concluded that a minor and *sua sponte* amendment of the decision is appropriate. The opinion is, therefore, revised to add a footnote to page 47. The opinion is otherwise unchanged. The clerk is directed to file the attached revised version *nunc pro tunc* to the original filing date of March 20, 2018.

The appellant's *Petition*, as well as the response, reply, and amicus curiae brief, were also circulated to all the active judges of the court who are not disqualified. *See* Fed. R. App. P. 35(a). As no judge on the original panel or the en banc court requested that a poll be called, that part of the *Petition* seeking en banc reconsideration is likewise denied.

2

Chief Judge Tymkovich has written separately to concur in the denial of en banc rehearing.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

16-4091 & 16-4098, *Utah Republican Party & Utah Democratic Party v. Cox*

**TYMKOVICH**, C.J., concurring in denial of rehearing en banc.

I concur in the court's denial of rehearing en banc. The majority and dissent clearly laid out the dueling arguments. I write separately to note the issues raised here deserve the Supreme Court's attention. The panel majority pledges continued faith in an oft-repeated strand of Supreme Court dicta which, as my dissent argues, has outlived its reliability. At this point, the Supreme Court's homage to State regulation of the primary election process is little more than a nod to received wisdom. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000); *see, e.g.*, *American Party of Tex. v. White*, 415 U.S. 767, 781 (1974).

Yet circumstances are much changed. Recent Supreme Court cases like *California Democratic Party v. Jones* suggest this dicta does not provide the whole truth. So too, do facts on the ground. The behemoth, corrupt party machines we imagine to have caused the progressive era's turn to primaries are now, in many respects, out of commission. In important ways, the party system is the weakest it has ever been—a sobering reality given parties' importance to our republic's stability. And given new evidence of the substantial associational burdens, even distortions, caused by forcibly expanding a party's nomination process, a closer look seems in order. The time appears ripe for the Court to reconsider (or rather, as I see it, consider for the first time) the scope of government regulation of political party primaries and the attendant harms to associational rights and substantive ends.

FILED
United States Court of Appeals
Tenth Circuit

March 20, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UTAH REPUBLICAN PARTY,

      Plaintiff - Appellant,

and

UTAH DEMOCRATIC PARTY,

      Plaintiff - Intervenor,

v.

SPENCER J. COX, in his official capacity
as Lieutenant Governor of Utah,

      Defendant - Appellee.

Nos. 16-4091/16-4098

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:16-CV-00038-DN)**
_____

Marcus Mumford, Mumford Law, Salt Lake City, Utah, for Plaintiff-Appellant.

David P. Billings, Fabian VanCott, Salt Lake City, Utah (Peter W. Billings and Charles A. Stormont, Fabian VanCott, Salt Lake City, Utah, and Clemens A. Landau, Zimmerman Jones Booher, Salt Lake City, Utah, with him on the briefs), for Plaintiff - Intervenor-Appellant.

Tyler R. Green (Stanford E. Purser with him on the brief), Utah Attorney General's Office, Salt Lake City, Utah, for Defendant-Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **LUCERO**, Circuit Judges.
_____

**EBEL**, Circuit Judge.

_____

These appeals are only the most recent volley in the spate of litigation that has dogged the Utah Elections Amendments Act of 2014, commonly known as SB54, since it was signed into law in March 2014. At issue here, SB54 reorganized the process for qualifying for a primary ballot in Utah, most importantly by providing an alternative signature-gathering path to the primary election ballot for candidates who are unable or unwilling to gain approval from the central party nominating conventions. Prior to the passage of SB54, the Utah Republican Party ("URP") selected its candidates for primary elections exclusively through its state nominating convention, and it would prefer to continue to do so.

In this litigation, the URP sued Utah Lieutenant Governor Spencer Cox in his official capacity ("the State")[1], alleging that two aspects of SB54 violate the URP's freedom of association under the First Amendment, as applied to the States by the Fourteenth Amendment. The two challenged sections (1) require parties to allow candidates to qualify for the primary ballot through either the nominating convention or by gathering signatures, or both (the "Either or Both Provision"); and (2) require candidates pursuing the primary ballot in State House and State Senate elections through a signature gathering method to collect a set number of signatures (the "Signature Requirement"). In two separate orders, the United States District Court for the District of Utah balanced the URP's First Amendment right of association

_____

[1] In Utah, the Lieutenant Governor administers the state election process.

2

against the State's interest in managing and regulating elections, and rejected the URP's claims.  Re-conducting that balancing de novo on appeal, we AFFIRM.

## I.  BACKGROUND

According to its constitution and bylaws, the URP's process for nominating a candidate to the general election proceeds along a singular path.  Candidates present their candidacy to the delegates at the party convention, and the delegates then caucus for nominees for each office.  If a single candidate achieves over 60% of the caucus vote, that candidate is certified to the state for placement on the general election ballot, and no primary is held.  If no candidate receives 60% of the convention vote, the top two candidates proceed to a state-administered primary election involving only URP members.  The winner of that primary election is then certified to the state for placement on the general election ballot.

In 2014, the Utah Legislature—comprised of overwhelming Republican majorities in both the State House and State Senate—passed SB54, which addressed this process.  Specifically, SB54 created two types of political parties: Registered Political Parties ("RPPs") and Qualified Political Parties ("QPPs").  Both RPPs and QPPs are eligible to have the name of the party printed next to their candidates on the general election ballot, Utah Code § 20A-6-301(1)(d); the only significant difference being how each is permitted to qualify candidates for its primary election.  Members of RPPs who wish to participate in a primary election may do so only by gathering

3

the signatures of 2% of the eligible primary voters for the office sought. Utah Code § 20A-9-403(3)(a).

If a party chooses to register as a QPP, however, it may still hold a caucus, and may certify the winners of the caucus to the primary ballot as before. See generally Utah Code § 20A-9-406 *et seq*. But unlike under the previous system, a party may not restrict access to the primary ballot just to candidates who emerge from the party convention. Under SB54, a candidate who is unwilling or unable to gain placement on the primary ballot through the caucus and convention may still qualify for the primary by gathering a set number of signatures by petition from eligible primary voters.[2] Specifically, SB54 provides that in order to qualify as a QPP the party must allow its members "to seek the registered political party's nomination for any elective office by the member choosing to seek the nomination by *either or both* of the following methods: (i) seeking the nomination through the registered political party's convention process . . . or (ii) seeking the nomination by collecting signatures[.]" Utah Code § 20A-9-101(12)(c) ("the Either or Both Provision") (emphasis added).

It is clear from our review of the record that this "two-path" system was a compromise crafted between Utah legislators hoping to preserve the URP's caucus system and outside interests pushing a pure primary system. The end result was that

---

[2] For the State House and State Senate these numbers are 1,000 and 2,000 respectively. Utah Code § 20A-9-408(8)(ii–iii) (the "Signature Requirement"). Those are the only two offices for which the Signature Requirement's constitutionality is at issue in this appeal. By contrast, the Either or Both provision, the constitutionality of which we also address in this appeal, applies to more than these two offices, and our consideration of that provision applies equally to all candidates and offices covered by SB54.

4

a QPP's primary ballot can now include both candidates who qualified through the caucus and candidates who qualified by gathering signatures. Utah Code § 20A-9-408. As originally passed, it also required parties to allow unaffiliated voters to participate in their primary elections (the "Unaffiliated Voter Provision"), but that provision was later invalidated and is not before us.

## II.  PROCEDURE AND JURISDICTION

### A. The First Lawsuit

SB54 was signed into law on March 10, 2014, and the URP filed suit later that year seeking an injunction and declaratory judgment that the law was unconstitutional as applied to the URP (the "First Lawsuit"). The Constitutional Party of Utah ("CPU") joined the First Lawsuit, challenging the Signature Requirement in particular.

In the First Lawsuit, the district court denied the URP and the CPU a preliminary injunction, ruling that none of the alleged constitutional burdens were severe save for the Unaffiliated Voter Provision, which was not yet ripe for review. Utah Republican Party v. Herbert, 133 F. Supp. 3d 1337 (D. Utah 2015) ("URP I"). Once the URP notified the state that it intended to become a QPP, that issue ripened and the district court granted the URP summary judgment invalidating the Unaffiliated Voter Provision. Utah Republican Party v. Herbert, 144 F. Supp. 3d 1263, 1278–82 (D. Utah 2015) ("URP II").

5

In doing so, the court held that the Unaffiliated Voter Provision imposed a severe burden on the URP's associational rights and the State had no compelling interest to justify that burden.  Id.  The practical effect of the First Lawsuit, then, was to invalidate SB54's Unaffiliated Voter Provision, see id., while upholding the Signature Requirement, the Either or Both Provision, and all other aspects of SB54, see id.; URP I, 133 F. Supp. 3d 1337.  The rulings in the First Lawsuit are not before us on appeal.[3]

## B.  The Second Lawsuit

After the First Lawsuit, the URP announced that it would permit nomination only by caucus.  The URP's justification for doing so was that it interpreted the Either or Both Provision as offering the *political party* (rather than the candidates) the option to allow nomination by either the signature gathering method, or the convention method, or both.  The Lieutenant Governor responded that it was the State's position that under SB54 it is the party *member's* choice, not the party's, whether to pursue the nomination using the signature gathering method, the convention method, or both.

Following this interpretation by the Lieutenant Governor, the URP filed this suit in the United States District Court for the District of Utah seeking declaratory and injunctive relief that SB54 was unconstitutional.  The phrasing of its Complaint was similar to the Complaint filed in the First Lawsuit.  See Utah Republican Party v.

---

[3] The first lawsuit is, however, relevant to the present appeal in part because the URP argues the State took positions during that lawsuit that it should be judicially estopped from retracting in this action.

6

Cox, 177 F. Supp. 3d 1343, 1354 (D. Utah 2016) ("URP III") (noting similarities). The party reiterated its argument that SB54 violated its freedom of association under the First and Fourteenth Amendments, and added a claim that the State should be judicially estopped from advancing an interpretation of the Either or Both Provision that differed from the one it advanced in the First Lawsuit. Shortly thereafter the Utah Democratic Party ("UDP") intervened as co-plaintiff to defend against the possibility that portions of SB54 would apply to one political party but not the other, and to complain that the URP's bylaws and constitution violated SB54.

In February of 2016, the district court certified two questions of state law to the Utah Supreme Court. The first requested that court's interpretation of the Either or Both Provision, asking whether that provision meant the candidate member or the party had the right to choose which—or both—of the qualification processes to use. See Utah Republican Party v. Cox, 178 F. Supp. 3d 1150, 1165 (D. Utah 2016) ("URP IV") (discussing certification). The Utah Supreme Court replied that the Either or Both Provision allows the candidate member, not the party, to select which of those two paths to follow in an effort to be certified to the primary ballot. Utah Republican Party v. Cox, 373 P.3d 1286, 1287 (Utah 2016). The second question, certified at the request of the UDP, was what would happen if a party elects to become a QPP under Utah law, but fails to comply with the requirements of that status. URP IV, 178 F. Supp. 3d at 1166. The Utah Supreme Court declined to answer the second question, finding it not ripe for review because it was not yet clear whether the URP was going to comply with SB54. Cox, 373 P.3d at 1288.

7

While waiting for those answers from the Utah Supreme Court, the UDP and the State filed motions in federal court for judgment on the pleadings, and the URP filed for partial summary judgment on its claims relating to the Signature Requirement. On April 6, 2016, the district court ruled that (1) the URP's claims were not barred by claim preclusion, issue preclusion, or claim splitting, (2) the State should not be judicially estopped from advancing its interpretation of the Either or Both Provision, and (3) the Signature Requirement was valid because it did not present a severe burden to the URP. URP III, 177 F. Supp. 3d at 1356, 1362, 1365. The district court granted summary judgment for the State on the judicial estoppel issue and also as to the signature requirements pursuant to Federal Rule of Civil Procedure 56(f). Id.

After the Utah Supreme Court answered the certified questions, the district court ruled on the remaining issues relating to the Either or Both Provision. It first held that the URP was not precluded from challenging the constitutionality of the Either or Both Provision, URP IV, 178 F. Supp. 3d at 1170, and that the Either or Both Provision—as interpreted by the Utah Supreme Court—did not infringe on the URP's First Amendment right of association, id. at 1179. Finally, the court rejected the URP's claim that SB54 was the result of impermissible viewpoint discrimination, and then the court granted summary judgment for the State. Id. at 1187.

URP timely appealed the district court's grant of summary judgment. The UDP subsequently cross-appealed, challenging the district court's denial of judgment on the pleadings based on assertions of claim preclusion, issue preclusion, and claim

8

splitting, and also the portions of the district court's opinion which purport to invalidate the URP's bylaws and constitution to the extent those provisions conflict with SB54. We consolidated the related appeals, and exercise jurisdiction under 28 U.S.C. § 1291.[4]

## III.  DISCUSSION

On appeal, this case presents two primary issues. First, the URP challenges the district court's decision to uphold the Either or Both Provision as a constitutional electoral regulation. Second, URP argues that the district court erred in concluding that the number of signatures required in the Signature Requirements for State House and State Senate are not unconstitutionally burdensome. The district court granted summary judgment for the State and against the URP on both these issues pursuant to Rule 56(f). See URP III, 177 F. Supp. 3d at 1371 (awarding summary judgment against the URP on the signature requirements under Fed. R. Civ. P. 56(f)); URP IV, 178 F. Supp. 3d at 1188 (awarding summary judgment against the URP on the Either or Both Provision under Fed. R. Civ. P. 56(f)). On appeal we also address claims raised by the UDP and the conduct of URP counsel Marcus Mumford.

"We review the district court's summary judgment de novo, applying the same standard as the district court," and drawing all reasonable inferences in the light most

---

[4] Upon initial review it was unclear whether all claims before the district court had been adjudicated to finality. See 28 U.S.C. § 1291 (restricting appellate review to "final" decisions from the district court). After we received supplemental briefing, it became clear to us that all issues had been ruled upon, dismissed as moot, or mooted by the district court's rulings, so there was a final decision below.

9

favorable to the non-moving party.  Ellis v. J.R.'s Country Stores, Inc., 779 F.3d 1184, 1191–92 (10th Cir. 2015) (internal citations and quotations omitted).  After careful review of the Record and the pleadings, we now AFFIRM the district court's grant of summary judgement for the Lieutenant Governor on both the Either or Both Provision and the Signature Requirements, conclude that the UDP's claims are not ripe for review, and decline to pursue sanctions against Mr. Mumford.  Each issue is addressed below.

## A.  The Either or Both Provision

Under SB54, a political party that chooses to register as a QPP, and is therefore eligible to maintain its caucus system, must alternatively allow its members the option to "seek the . . . party's nomination for any elective office by the member choosing to seek the nomination by *either or both* of the following methods: (i) seeking the nomination through the [the party's] convention process . . . (ii) seeking the nomination by collecting signatures . . . ."  Utah Code § 20A-9-101(12)(c) (emphasis added); see also Cox, 373 P.3d at 1287 (Utah 2016) (interpreting that provision to offer the member, rather than the party, the choice).  On appeal, the URP argues that this provision is an unconstitutional burden on its freedom of association under the First and Fourteenth Amendments.  Aplt. Br. at 32–33 (citing N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 202–03 (2008)).

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'"  Burdick v. Takushi, 504 U.S. 428, 433 (1992) (quoting Ill. Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979).  Access to

10

the ballot and the ballot box is the necessary catalyst in the carefully calibrated system of individual freedoms and separation of powers crafted by our founding fathers.  Accordingly, we take great care to scrutinize any electoral regulation that would appear to restrict this access.

"It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute," Burdick, 504 U.S. at 433 (citing Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986)), or that a state may not pass reasonable, nondiscriminatory electoral regulations.  The Constitution grants states the right to prescribe "[t]he Times, Places and Manner of Holding Elections for Senators and Representatives," Art I, § 4, cl. 1, and the Supreme Court has held that states enjoy similar authority to regulate their own elections, see, e.g., Tashjian v. Republican Party of Conn., 479 U.S. 208, 217 (1986).  The Court has further recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  Storer v. Brown, 415 U.S. 724, 730 (1974).

These regulations, however, whether they prescribe the time, place, and manner of elections or otherwise provide for orderly selection of the people's representatives, will invariably impose some burden upon individual voters and political parties.  See Anderson v. Celebrezze, 460 U.S. 780, 788 (1983).  For example, even a state's decision to close its polls at 7:00 PM instead of 8:00 PM will invariably burden some voters—and therefore their respective parties—for whom the

11

earlier time is inconvenient; so too, however, if the state chose 8:00 PM instead of 9:00 PM. These burdens, then, must necessarily accommodate a state's legitimate interest in providing order, stability, and legitimacy to the electoral process. See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) ("[I]t is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.") (internal citations omitted).

Amidst this confluence of interests and burdens we analyze electoral regulations using the now-familiar Anderson-Burdick balancing test. Under Anderson-Burdick,

> a court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

Burdick, 504 U.S. at 434 (quoting Anderson, 460 U.S. at 789). If, a regulation is found to impose "severe burdens" on a party's associational rights, it must be "narrowly tailored to serve a compelling state interest." Clingman v. Beaver, 544 U.S. 581, 586 (2005) (citing Timmons, 520 U.S. at 358). "However, when regulations impose lesser burdens, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" Clingman, 544 U.S. at 586-87 (quoting Timmons, 520 U.S. at 358).

### 1. The Party's Burdens

This case addresses Utah's electoral regulations contained in SB54 that target the method by which a QPP selects its nominee to appear on the general election ballot for state and federal offices. In this process both the political party and the state have legitimate constitutional interests that need to be balanced. While states play an important role in "structuring and monitoring the election process, including primaries," the political parties also have a First Amendment Right of Association that has to be balanced against the state's interests. Cal. Democratic Party v. Jones, 530 U.S. 567, 572 (2000). It is through primary elections that a "party's positions on the most significant public policy issues of the day" are often determined, and it is a party's "nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." Id. at 575. The URP argues that SB54 infringes on its First Amendment associational rights by forcing it to adopt a candidate-selection process different from that which it would prefer. However, the Supreme Court has recognized that when political parties become involved in a state-administered primary election, the state acquires a legitimate interest in regulating the manner in which that election unfolds—subject only to the same interest-balancing that occurs throughout the Court's electoral jurisprudence.

The distinction between wholly internal aspects of party administration on one hand and participation in state-run, state-financed elections on the other is at the heart of this case. When a party selects its platform, its Chairman, or even whom it will endorse in the upcoming election, the state generally has no more interest in these internal activities than in the administration of the local Elks lodge or bar association.

13

But when the party's actions turn outwards to the actual nomination and election of an individual who will swear an oath not to protect the Party, but instead to the Constitution, and when the individual ultimately elected has the responsibility to represent all the residents in his or her district, the state acquires a manifest interest in that activity, and the party's interest in such activity must share the stage with the state's manifest interest. The dissent blurs this distinction between the party's internal and external activity.[5]

The Supreme Court's jurisprudence has consistently reflected this difference between a party's internal mechanisms and its external manifestations.

> A political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform. These rights are circumscribed, however, when the State gives the party a role in the election process—as New York has done here by giving certain parties the right to have their candidates appear with party endorsement on the general-election ballot. Then . . . the State acquires a legitimate governmental interest in ensuring the fairness of the party's nominating process, enabling it to prescribe what that process must be.

N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 202–03 (2008) (internal citations omitted).

Lopez Torres may be a relatively modern case, but the Supreme Court's recognition of the state's vital regulatory role in primary elections is hardly a recent development. As early as 1941 the Supreme Court held that state-administered

---

[5] See Richard H. Pildes, The Constitutionalization of Democratic Politics, 118 Harv. L. Rev. 28, 107, 107 n.323 (2004) ("[C]ourts must engage in direct, functional analysis of the role of parties and primaries in American democracy. That analysis is not furthered by reasoning analogically from the Jaycees, the Boy Scouts, the Mormons, or similar religious or civil-society entities.").

14

primary elections, as a "necessary step in the choice of candidates for election as representatives[,]" are subject to congressional and state regulation. United States v. Classic, 313 U.S. 299, 319–20 (1941). As our country grappled with the scourge of racial and economic discrimination at the ballot box, the Supreme Court consistently intervened in the so-called "White Primary Cases" to recognize that primary elections—or even pre-primary party activity that restricted access to the primary ballot—were sufficiently "state action" to trigger application of the Reconstruction Amendments. See Terry v. Adams, 345 U.S. 461, 469–70 (1953); Smith v. Allwright, 321 U.S. 649, 663–64 (1944).

To be sure, the "White Primary" cases do not stand for the proposition that the "processes by which political parties select their nominees are . . . wholly public affairs that States may regulate freely." Jones, 530 U.S. at 572–73. Nor do we suggest that a party's decision to restrict its primary to only convention delegates via the caucus approach is anywhere near the overt discrimination at issue in those cases. Rather our consideration of those cases extends only insomuch as they indicate that a party's external activities in selecting candidates for public office must necessarily be subject to greater state involvement and scrutiny than its wholly internal machinations.[6]

---

[6] To use the dissent's example, the process by which parishioners choose their priest has no external application. See Dissent at 16. A priest does not appear on a state-run, state-financed ballot, and if a priest is successful in an election his duty is to his parish and his faith, not the broader citizenry of the state or district. The state has no interest, then, in the process by which that priest is chosen. But the URP is not a parish or a club, but rather a political association whose activities run the gamut from

In recognition of the state's role in ensuring a democratic and fair primary election the Supreme Court has called it "too plain for argument . . . that the State may . . . insist that intraparty competition be settled before the general election by primary election or by party convention." Am. Party of Tex. v. White, 415 U.S. 767, 781 (1974). Then, in 2000, the Court elaborated further, ruling that "a state may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion." Jones, 530 U.S. at 572 (citing White, 415 U.S. at 781). All told, by the time Lopez Torres arrived in 2008, the Court considered the issue settled, mentioning in passing: "To be sure, we have . . . permitted States to set their faces against 'party bosses' by requiring party-candidate selection through processes more favorable to insurgents, such as primaries." 552 U.S. at 205.

We recognize that each of these statements, while instructive, is technically dicta, but it appears to be clearly established dicta. See Jones, 530 U.S. at 594 (Stevens, J., dissenting) ("I think it clear—though the point has never been decided by this Court—'that a State may require parties to use the primary format for selecting their nominees.'") (quoting majority). We are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta

_____

purely internal—such as voting on the party platform—to a hybrid internal-external—such as nominating candidates who will appear on the general election ballot in the hopes of being elected to represent not the URP, but the broader citizenry of Utah. The entire point of the Supreme Court's jurisprudence in this area is to recognize that the state's ability to regulate the association is not the same in the second instance as it is in the first.

16

is recent and not enfeebled by later statements." Gaylor v. United States, 74 F.3d 214, 217 (10th Cir. 1996) (internal citations omitted). This principle is especially relevant where, as here, the dicta has been explicitly reaffirmed several times, across multiple different eras, by Justices both in support and in dissent. See Tashjian v. Republican Party of Conn., 479 U.S. 208, 237 (1986) (Scalia, J., dissenting) (basing argument on "the validity of the state-imposed primary requirement" because the Supreme Court has "hitherto considered [that validity] 'too plain for argument'"). Finally, if we were hesitant to follow this dicta, we could perhaps be persuaded by our own circuit having favorably cited—without relying—on this very language as early as 1988. See Rainbow Coal. of Okla. v. Okla State Election Bd., 844 F.2d 740, 745 n.7 (10th Cir. 1988) (noting that "the Supreme Court has pointed out 'that the State may . . . insist that intraparty competition be settled before the general election by primary election or by party convention'").[7] In short, we are unwilling to ascribe to so many jurists the contention that their reliance on this dicta was "completely assumed and unreasoned." See Dissent at 37.

---

[7] We are hardly alone in recognizing the weight of this dicta. See, e.g., Alaskan Indep. Party v. Alaska, 545 F.3d 1173, 1178 (9th Cir. 2008) (relying on this dicta to uphold a primary scheme similar to the one at issue here); Cool Moose Party v. Rhode Island, 183 F.3d 80, 83 n.4 (1st Cir. 1999) (suggesting based on White that a mandatory primary is constitutional); Lightfoot v. Eu, 964 F.2d 865, 872 (9th Cir. 1992) (upholding a mandatory primary in part based on dicta from White); Az. Green Party v. Bennett, 20 F. Supp. 3d 740, 748 (D. Ariz. 2014) (citing favorably to Jones to establish that a party could not insist on using a nominating convention to avoid a burdensome state law); Greenville Cty. Republican Party Exec. Comm. v. South Carolina, 824 F. Supp. 2d 655, 666 n.7 (D. S.C. 2011) (relying on White for proposition that a state may "mandate that a single nomination method be used by all candidates and political parties").

Furthermore, even beyond this consistent dicta, the Supreme Court has explicitly upheld a State's ability to regulate the *scope* of a party primary. In Clingman v. Beaver, the Court considered the constitutionality of an Oklahoma law restricting the right to vote in party primary elections to voters who were registered as either independents or as members of the party. 544 U.S. at 584. There, a party that wanted to open its primary to all registered voters sued, and the Court found that the restrictive regulation only "minimally" burdened the party. Id. at 590. The Court so held because "Oklahoma's law does not regulate the [party's] internal processes, its authority to exclude unwanted members, or its capacity to communicate with the public." Id.

The same could be said of SB54. SB54 does not regulate the party's internal process; in fact its grand compromise was to maintain the URP's traditional caucus system as a path onto the primary ballot. Furthermore, because the First Lawsuit excised the Unaffiliated Voter Provision, the law no longer proscribes the URP's authority to exclude unwanted members from its primary. Finally, nothing in SB54 prevents the URP from endorsing the candidate of its choice and using traditional advertising channels to communicate that endorsement to the state's voters. Contra Eu v. S.F. Cty. Democratic Cent. Comm., 489 U.S. 214, 222–29 (1989) (invalidating a California ban on primary endorsements). In light of the Supreme Court's recent and consistent dicta, as well as its holding in Clingman, we see no choice but to find the Either or Both Provision only minimally burdensome on the URP.

18

As a final salvo, however, the URP argues that the Either or Both Provision imposes severe burdens on its associational rights because it leaves the party vulnerable to being saddled with a nominee with whom it does not agree.  See Aplt. Br. at 40.  We are not so persuaded.

First and foremost, this case is not, as the dissent would suggest, about who the candidates are, but rather who the deciders are.  SB54 was not designed to change the substantive candidates who emerged from the parties, but rather only to ensure that all the party members have some voice in deciding who their party's representative will be in the general election.  SB54's goal was to ensure only that the will of all the URP was not being truncated by an overly restrictive and potentially unrepresentative nominating process.

Balancing the State's interests against the interests of an association requires us to define the association with the requisite specificity.  Here, where the argument is that SB54 may lead to a party nominating a candidate with whom it may not agree,[8] the question before this Court is whether the burdens imposed on *the URP* by

---

[8] This is not to suggest that we disagree with the dissent's observation that "[p]olitical science literature has long observed parties have several components, only one of which is their membership."  Dissent at 24.  But in this context, in which the question is whether the party is being forced to associate with individuals with whom it may not agree, the Supreme Court has instructed that the relevant "Party" is the collection of party members.  In Jones, the Supreme Court distinguishes between "party leadership['s]" ability to endorse a candidate and "party members'" ability to choose a nominee.  530 U.S. at 580.  This distinction makes clear who the Jones majority is referring to when it references "the party" in the final sentences of the two ensuing paragraphs: "In any event, the ability of the party leadership to endorse a candidate does not assist the party rank and file, who may not themselves agree with the party leadership, but do not want *the party's* choice decided by outsiders. . . .

19

SB54 are minimal or severe.  See Aplt. Br. at 31 (defining the first step of the

Anderson-Burdick test as whether the law burdens a "political party's constitutional

rights.").  Put another way, our task today is to analyze SB54's burdens on the Utah

Republican Party, or, put still differently, the group of like-minded individuals in

Utah who have joined together under the banner of the Republican Party—rather than

just the leadership of the party.

The URP, like all political parties, has "a right to identify the people who

constitute the association, and to select a standard bearer who best represents the

*party's* ideologies and preferences."  Eu, 489 U.S. at 224 (internal citations and

quotations omitted) (emphasis added).  That is why the district court declared the

Unaffiliated Voter Provision, which forced the URP to allow nonmembers to help

select its candidates, unconstitutional in the First Lawsuit. URP II, 144 F. Supp. 3d.

at 1280.

But now that the Unaffiliated Voter Provision has been excised from SB54, the

URP is no longer in danger of fielding a general election candidate who does not

enjoy the support of at least a plurality of the voting members of the Utah Republican

Party.[9]  It is true, as has happened since the passage of SB54, in fact,[10] that the

---

There is simply no substitute for *a party's* selecting its own candidates."  Id. at 581
(emphasis added).

[9] The Court is aware that under the new process, unlike under the old—in which no
more than two candidates could advance from the URP convention to the primary
ballot—the URP's general election candidate could potentially receive a plurality,
rather than a majority, of votes in the primary election.  The Court recognizes the
party's interest in avoiding this outcome.  However, while this interest was

eventual nominee may not enjoy the support of a plurality of the roughly 3,500 party delegates that comprise the URP's caucus electorate. But that failure does not implicate the associational rights of the *party*, which consists of the roughly 600,000 registered Republicans in Utah, and which is not limited to the party-convention-delegates.

The party leaders and convention delegates are still free to communicate to the rest of their party which of the candidates on the primary ballot the leadership supports.[11] But if the URP wants to open its doors to roughly 600,000 people across the state of Utah, the associational rights *of the party* are not severely burdened when the will of those voters might reflect a different choice than would be made by the party leadership. To say otherwise is to erroneously conclude that the rights and interests of the association extend only to the rights and interests of the party leadership. See <u>Tashjian</u>, 479 U.S. at 215 ("A major state political party necessarily

---

mentioned at Oral Argument, it was not included in the argument section of the URP's brief, and we "routinely have declined to consider arguments that are not raised, or are inadequately presented in an appellant's opening brief." <u>Bronson v. Swensen</u>, 500 F.3d 1099, 1104 (10th Cir. 2007). Furthermore, even if we do consider this newly advanced interest, we find that, in light of this country's historic recognition of the legitimacy of plurality-based elections, the additional burden this imposes on the URP is, at most, minimal. <u>Cf.</u> <u>Whitcomb v. Chavis</u>, 403 U.S. 124, 160 (1971) ("[W]e are unprepared to hold that district-based elections decided by plurality vote are unconstitutional . . . .".).

[10] <u>See</u> John Verhovek, Saisha Talwar, and Adam Kelsey, *Moderate mayor wins republican primary to replace Rep. Chaffetz in* <u>Utah</u>, ABCNews.com, Aug. 15, 2017, http://abcnews.go.com/Politics/utahs-special-election-primary/story?id=49216793.

[11] The URP may still communicate that information using the traditional channels of political advertising.

includes individuals playing a broad spectrum of roles in the organization's

activities.").[12] In further support, we need only look to the Supreme Court for

unambiguous direction: "To be sure, we have . . . permitted States to set their faces

against 'party bosses' by requiring party-candidate selection through processes more

favorable to insurgents, such as primaries." Lopez Torres, 552 U.S. at 205.[13]

---

[12] We also note that, in its Complaint filed in this lawsuit, the URP repeatedly referred to SB54 as burdening the rights of "the Party and its members." See, e.g., Aplt. App. at 26 ("The First and Fourteenth Amendments to the United States Constitution guarantee *to the Party and its members* the right to associate in a political party[.] . . . These are core Constitutional freedoms held *individually and collectively* by the members of the Utah Republican Party, and by the Party itself.") (emphasis added). This accords with how the Supreme Court has identified the constitutional right of association as it relates to a political party. See Norman v. Reed, 502 U.S. 279, 288 (1992) ("For more than two decades, this Court has recognized the constitutional right of citizens to create and develop new political parties. The right derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their political preferences.").

[13] The dissent cites to Eu, Dissent at 25, as a case where, according to the dissent, the Supreme Court draws a distinction between the "Party" and its "members." However that is not an accurate reading of Eu. It is true that in Eu the Court uses the phrase "the parties and their members," but that phrase is used inclusively rather than drawing a distinction between a party and its members. 489 U.S. at 232. The rights of "the Party and their members" emphasizes the unity of the Party and its members rather than attempting to draw a distinction between them. See also Timmons, 520 U.S. at 351.

Eu is also distinguishable in that it dealt primarily with the issue of a political party in the speech, as opposed to associational, context. Party leadership may enjoy different First Amendment speech rights than do individual members. Jones itself discusses this distinction. 530 U.S. at 580 ("The ability of the party leadership to endorse a candidate [speech context] is simply no substitute for the party members' ability to choose their own nominee [associational context]."). This line leaves little doubt that the scope of a political organization includes its members.

22

The unambiguous import of Lopez Torres is that *in order to "set their faces against 'party bosses'"* states may require primary elections.  See id. (emphasis added).  This language establishes that the associational rights of a political party expand beyond the party leadership, and would be toothless if party bosses could dictate how candidates can qualify for the primary ballot, perhaps, for example, by requiring candidates to win the support of "party bosses" in order to qualify for the primary ballot, leading to primary "elections" with a single candidate on the ballot.  See also Alaskan Indep. Party v. Alaska, 545 F.3d 1173, 1179–80 (9th Cir. 2008) (noting its skepticism that a scheme similar to that at issue in this case imposes a severe burden on a party's associational rights).

Finally, the dissent relies on Jones, but Jones is not contrary to our holding.  In that case, the Supreme Court held that states could not force parties to allow non-members—"those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival"—to participate in that party's primary election.  Jones, 530 U.S. at 577.  Understandably, the Court held that such a "forced association" intruded on the party's First Amendment associational rights.  Jones, 530 U.S. at 577; see also Democratic Party of the U.S. v. Wisc. ex rel. La Follette, 450 U.S. 107, 123–24 (1981).

But no such burden exists in this case.  When SB54 was initially passed, it did contain a significant associational burden in that it forced the party to associate with unaffiliated voters.  However, that issue was fought in the first lawsuit, and the URP won.  Now the URP's nominee is decided only by those individuals who have chosen

23

to associate with the Party. Following the first lawsuit, SB54 is perfectly compliant with the holding in Jones.

For these reasons, we conclude that SB54 does not impose a severe burden on the URP by potentially allowing the nomination of a candidate with whom the URP leadership disagrees. Therefore, in recognition of the Supreme Court's repeated and un-recanted dicta, we hold that the Either or Both Provision is at most only a minimal burden on the URP's First Amendment associational rights.[14]

## 2. The State's Interests

When an electoral provision "places no heavy burden on associational rights," as we hold the Either or Both Provision does not, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Clingman v. Beaver, 544 U.S. 581, 593 (2005) (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997)). This was the approach adopted by the district court, which upheld the Either or Both Provision relying on the State's important regulatory interests of "managing elections in a controlled manner,

---

[14] While the dissent can speculate that SB54 "interferes with the Party's internal procedures, changes the kinds of nominees the Party produces (is, in fact, meant to do so), allows unwanted candidates to obtain the Party nomination, causes divisiveness within the Party, and reduces the loyalty of candidates to the Party's policies[,]" Dissent at 21, we believe that is simply not an accurate representation of the record before us.

24

increasing voter participation, and increasing access to the ballot." URP IV, 178 F.

Supp. 3d at 1179 (citing Utah Code §§ 20A-9-401, 2-300.6).[15]

---

[15] The dissent attempts to equate the motives of an advocacy group, Count My Vote ("CMV") with that of the Utah legislature. See, e.g., Dissent at 5, 17, 21, 32. The problem with this approach is that in discerning legislative intent we look not to the motive of advocacy groups, lobbyists, or even individual legislators, but the legislature as a whole. So let's talk about the legislature. First, a substantial majority of the members of the Utah legislature are members of the URP. Second, if we were to look to advocates rather than legislators, all indications are that CMV's goal was not to determine *who* won the URP's nomination, but rather *how* that nominee was selected. Finally, the record reflects that the Utah legislature was motivated to preserve a representative and fair process rather than focusing on the specific outcome of the process.

Let's step back for a minute and reflect on what really happened. The process that led to SB54 is certainly not determinative to our outcome, but it may be informative. On one hand, the URP wanted to preserve its traditional caucus and convention system, which was susceptible to strong influence by Party leadership. On the other hand, CMV wanted a mandatory primary, which would entirely eliminate the URP's preferred system. CMV had a powerful piece of ammunition in its arsenal in that it was threatening to take its idea to the voters directly via a ballot initiative, and apparently the Republican majority in the state legislature gave credence to that possibility. Thus was born the "Grand Compromise" where both sides got something they wanted. The Party received the assurance that the nominee it selected through its preferred caucus system would appear on the primary ballot. CMV ensured that all party members had the opportunity to play a meaningful role in selecting their Party's nominee through a direct primary vote. And URP leadership still retained the ability to advise the party membership as to who they endorsed and to advertise and campaign for their preferred candidate. And who, perhaps, was the biggest winner of this compromise? It was the heart and soul of the Republican Party: its members writ large. They were given the right to ensure that they, the URP, could decide with whom they wanted to associate on the general election ballot. This compromise illustrates the best aspects of representative democracy and honors the diverse interests that make up any political subdivision or district. See Robert Gehrke, Senate advances bill that would nullify Count My Vote initiative, Salt Lake Tribune, http://archive.sltrib.com/article.php?id=57575253&itype=CMSID (Feb. 20, 2014, 6:08PM) (last visited, Feb. 28, 2018); Robert Gehrke, It's back on: Legislators, Count My Vote renew deal on election reform, Salt Lake Tribune, http://archive.sltrib.com/article.php?id=57619746&itype=CMSID (March 2, 2014, 9:44AM) (last visited, Feb. 28, 2018).

25

The State favorably adopted the court's reasoning on appeal, arguing that the Either or Both Provision is a "reasonable regulation furthering the important Utah interests of managing elections in a controlled manner, increasing voter participation, and increasing access to the ballot[.]" Aple's Br. at 34. Furthermore, these interests were not the creation of the district court, but were rather advanced by the State in its motion for summary judgment. Aplt. App. 629 n.91.

The Supreme Court has, in the past, accepted similar articulations of a state's interest in regulating elections. See, e.g., Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 191 (2008) (describing the state interest generally as an interest in "protecting the integrity and reliability of the electoral process"); Clingman, 544 U.S. at 593–94 (identifying state interests generally as "preserv[ing] political parties" and "enhance[ing] parties' electioneering and party-building efforts"); Timmons, 520 U.S. at 364 ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes.").

These state interests constitute the very backbone of our constitutional scheme—the right of the people to cast a meaningful ballot. That is one of the rights through which all other rights are protected. In designing our delicate constitutional scheme the founders recognized the importance of representative democracy. They believed it was "essential to liberty that the government in general should have a common interest with the people," and they designed a system in which certain branches of government "have an immediate dependence on, and an intimate

26

sympathy with, the people." The Federalist, No. 52 (James Madison) (Terrance Ball ed., 2003).[16]

Against this backdrop, a survey of the modern political landscape and its decreasing number of truly competitive legislative districts demonstrates that this right can be impaired or even rendered meaningless if not protected at the primary level. Now, more than ever, "we cannot close our eyes to the fact . . . that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election . . . and may thus operate to deprive the voter of his constitutional right of choice." Classic, 313 U.S. at 319. A government that refused to acknowledge its interest in protecting representative democracy during primary elections would be ignoring its solemn obligation to preserve Madison's "sound and important principle that the representative ought to be acquainted with the interests and circumstances of his constituents." The Federalist, No. 56 (James Madison) (Terrance Ball ed., 2003). After all, "a dominant party's primary can determine the representative ultimately elected[,]" LULAC v. Perry, 548 U.S. 399, 487 (2006) (Breyer, J., concurring in part and dissenting in

---

[16] See also Spencer Overton, Voter Identification, 105 Mich. L. Rev. 631, 657 (2007) (explaining that "widespread participation" is a "crucial democratic value" for four reasons: (1) exposing decision-makers to new ideas and viewpoints, (2) ensuring democratic legitimacy, (3) redistributing government resources and priorities to reflect evolving problems and needs, and (4) furthering self-fulfillment and self-definition of individual citizens); Frances R. Hill, Putting Voters First: An Essay on the Jurisprudence of Citizen Sovereignty in Federal Election Law, 60 U. Miami L. Rev. 155, 156–57 (2006) ("The concept of consent as suggested by the first sentence of the Constitution is not limited to the single act of ratifying the Constitution, but rather is a process of continuing consent, expressed through continuing participation. Such participation is the foundation of representative government.").

part), and "[a]s a practical matter, the ultimate choice of the mass of voters is predetermined when the nominations [by the major political parties] have been made." Morse v. Republican Party of Va., 517 U.S. 186, 205–06 (1996) (plurality opinion) (internal quotations omitted) (alteration in original).

Are the voters who only participate in party primaries smarter than those who gather for a caucus or convention? Do they make better choices? Perhaps not. But it is not for us to debate the desirability of their outcomes if the voters are given a fair chance to express their preferences.

### 3. Balancing the Burden on the Party against the Interests of the State

How could it not be true in a representative democracy such as ours that the State has a strong—even compelling—interest in ensuring that the governed have an effective voice in the process of deciding who will govern them? On balance, then, the State interests in SB54 surely predominate over the minimal burdens imposed upon the URP.[17] Accordingly we AFFIRM the district court's holding that the Either or Both Provision is a constitutional exercise of the State's regulatory authority.[18]

---

[17] The Ninth Circuit, presented with a similar law establishing a mandatory primary at the expense of a party-nominating convention, held that the law survived even strict scrutiny because it was narrowly tailored to advance the compelling state interest of "eliminating the fraud and corruption that frequently accompanied party-run nominating conventions." Alaskan Indep. Party v. Alaska, 545 F.3d 1173, 1180 (9th Cir. 2008). We have no occasion to assess whether SB54 could similarly survive strict scrutiny, but find that case nonetheless instructive in our assessment that SB54's similar restrictions can survive much less intensive scrutiny.

[18] The URP also argues that the State should be judicially estopped from taking the position that the candidate, not the party, is able to decide whether to seek the nomination through the convention or through submitting signatures. Aplt. Br. at 48–

## B.      The Signature Gathering Requirement

The URP also argues that SB54 is unconstitutional because the signature requirements for State House and State Senate are overly burdensome.[19] Given that the URP's established procedures do not involve a signature-gathering path at all, the URP's preference is clearly to have the signature-gathering path to the primary ballot eliminated all-together. Nonetheless, the crux of the URP's argument challenging this section is that the sheer number of signatures required to access the primary ballot for these two offices is too high a barrier to entry, and thus it unconstitutionally burdens the URP's right of association. Put differently, the URP argues here that the petition requirements established in SB54 make it too difficult to qualify for the primary ballot for these offices, notwithstanding the fact that the URP would undoubtedly prefer the signature-gathering requirements be so difficult to attain that the only candidates who ever qualified for the primary were the candidates who qualified by winning the URP's caucus.

---

50. Its argument is based on a colloquy between the judge and counsel for the State in the First Lawsuit. After reading the exchange, Aplt. App. 345–47, the Court is not left with the impression that the position advanced by the State in the First Lawsuit is "clearly inconsistent" with the position it advances now, see Hansen v. Harper Excavating, Inc., 641 F.3d 1216, 1227 (10th Cir. 2011). For this reason, not to mention the URP's failure to cite to the Record in the argument section of its brief, see Fed. R. App. P. 28(a)(8)(A), we AFFIRM the district court's decision not to apply judicial estoppel.

[19] While SB54 establishes varying signature requirements to access the primary ballot for all elections, the district court only discussed the potential unconstitutionality of the requirements for two offices: State House and State Senate. URP III, 177 F. Supp. 3d 1343, 1365 (D. Utah 2016). Therefore we restrict our consideration of the signature requirements to the requirements established for those two offices.

We pause briefly to note that SB54's severability clause would likely preclude us from striking down the entire law even were we to rule in favor of the URP on this issue, see Utah Code § 20A-1-103, but we nonetheless consider this argument in the alternative, and ultimately conclude that the Signature Requirements—while a burden—are not unconstitutional under the Anderson-Burdick balancing test as applied to the URP.

Any form of candidate eligibility requirement necessarily implicates basic constitutional rights, but as a practical matter "not all restrictions imposed by the States on candidates' eligibility [to appear on the] ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." Anderson, 460 U.S. at 788. As we have previously held, a "state has a legitimate interest in requiring a showing of a 'significant modicum of support' before it prints on the state election ballot the name of a political party and its slate of candidates,'" noting that such a requirement "serves the important state interest of avoiding 'confusion, deception, and even frustration of the democratic process[.]" Artunoff v. Okla. State Election Bd., 687 F.2d 1375, 1378 (10th Cir. 1982) (quoting Jenness v. Fortson, 403 U.S. 431, 442 (1971)). We have further recognized that there is no hard-and-fast rule as to when a restriction on ballot eligibility becomes an unconstitutional burden. See Artnunoff, 687 F.2d at 1379. Instead, candidate eligibility requirements are considered under the Anderson-Burdick balancing test, in which a court is to weigh the character and magnitude of the asserted injury to the

30

plaintiff against the interests advanced by the State as justifications for the eligibility requirements.  Anderson, 460 U.S. at 789.

Under SB54, an individual who wants to follow the signature-gathering path onto a State Senate primary ballot is required to collect 2,000 signatures of registered voters who are residents of the district and permitted by the party to vote for its candidates in a primary election.  Utah Code § 20A-9-408(8)(b)(iii).  For a candidate for the State House, the requirement is 1,000 signatures.  Id § 20A-9-408-(8)(b)(iv).  The district court stated that these requirements, considered alone, "may be unconstitutional as applied to the URP."  URP III, 177 F. Supp. 3d at 1366 ("[T]he signature gathering requirements under Utah Code §§ 20A-9-408(8)(b)(iii) and -408(8)(b)(iv) . . . may be unconstitutional as applied to the URP.").  Nonetheless, because the court found signature gathering to be only an additional way of accessing the ballot, and the other way to access the ballot—via the convention path—constitutional, the district court did not invalidate the Signature Requirement,  nor did it strike down the law as a whole, relying on LaRouche v. Kezer, 990 F.2d 36 (2d Cir. 1993).  URP III, 177 F. Supp. 3d at 1368.

### 1. **LaRouche v. Kezer**

In LaRouche, two candidates for the Democratic nomination for president challenged their inability to qualify for the Connecticut primary election ballot.  LaRouche, 990 F.2d at 37.  At issue were two Connecticut ballot-access laws.  The first, the "media recognition" statute, required the Secretary of State to place on the primary ballot those candidates who are "generally and seriously recognized

31

according to reports in the national or state news media." Id. (quoting Conn. Gen. Stat. § 9–465(a) (1989)). The second, the "petition alternative" statute, enabled candidates failing to gain access under the media recognition statute to appear on the ballot "if, within the next fourteen days, they collect signatures from one percent of their party's registered voters." Id. (citing Conn. Gen. Stat § 9–465(b), 9–467 to 469 (1989)).

The district court in that case examined the two statutes in isolation, ultimately upholding the petition alternative but ruling that the media recognition statute was void for vagueness. LaRouche v. Kezer, 787 F. Supp. 298, 304–05 (D. Conn. 1992). On appeal, the Second Circuit held that the district court had erred in analyzing each statute separately. Rather, the court held, the constitutionality of a state's ballot access provisions should be examined in light of the entirety of the state's comprehensive election code. LaRouche, 990 F.2d at 39 (citing Burdick v. Takushi, 304 U.S. 428, 438–39 (1992); Storer, 415 U.S. at 738–40 (1974); Am. Party of Tex., 415 U.S. at 786–87). From this perspective, the court concluded that:

> if the petition alternative would be constitutional standing alone, the additional method of a media recognition test is not in any sense an unconstitutional burden. To the contrary, because it is not constitutionally required, the media recognition test, whether or not vague, increases the opportunities to get on the ballot and reduces the burdens on candidates. . . . In short, if the district court was correct about the constitutionality of the petition alternative standing alone, then the media recognition statute is a fortiori valid as an additional means of ballot access.

LaRouche, 990 F.2d at 38–39. The court did add, however, that this approach would not save a ballot qualification statute if the statute were "wholly irrational—a coin-

32

flip test, for example[.]" Id. at 38 n.1. The lesson from LaRouche, then, is that, provided it is not wholly irrational, an otherwise unconstitutional ballot-access statute will not be struck down so long as there is an alternative, constitutional, method of accessing the ballot.

We do not in this case need to adopt this as a per se rule. We do, however, agree with the LaRouche court's recognition of Supreme Court precedent—not to mention our own precedent—as requiring us to analyze ballot-access opportunities in sum rather than in isolation. See, e.g., Burdick, 504 U.S. at 438–39 (finding a ban on write-in voting to be a limited burden "in light of the adequate ballot access afforded under Hawaii's election code."); Artunoff, 687 F.2d at 1379 (holding that the constitutionality of state ballot access laws should be determined only after "due consideration is given to the practical effect of the election laws of a given state, viewed in their totality") (citing Clements v. Fashing, 457 U.S. 957 (1982)). The lesson we take from LaRouche, then, is that when conducting Anderson-Burdick balancing with regards to state ballot-access laws, due weight should be accorded to whether a challenged provision stands in isolation as the sole method for accessing the ballot, or whether candidates have alternative and constitutionally sufficient paths through which to qualify. In the latter circumstance, the burden that any one particular route to ballot access that the law places on candidates, voters, and parties is necessarily reduced.

## 2. SB54

33

Applying this approach to the Utah Election Code, we find that the Signature Requirement withstands constitutional scrutiny.

SB54 provides two methods for candidates to qualify for the primary ballot for a QPP. First, a candidate may qualify for the primary ballot at the QPP's nominating caucus. Utah Code § 20A-9-407. No party to this lawsuit challenges the constitutionality of this provision, and in fact the URP's primary assertion, as discussed above, is that this should be the *only* available method for qualifying for the Republican primary ballot. Therefore, we accept that there is at least one constitutional method of ballot access under the Utah election code.

The second method allows a candidate to gain access to the primary ballot by gathering signatures of "registered voters in the state who are permitted by the qualified political party to vote for the qualified political party's candidates in the primary election." Utah Code § 20A-9-408(8). For candidates seeking a place on the ballot for State House, the law requires the collection of 1,000 signatures. Id. at 20A-9-408(8)(b)(iv). For candidates seeking a place on the ballot for State Senate, the required number swells to 2,000. Id. 20A-9-408(8)(b)(iii).[20]

---

[20] When it drafted these figures the Utah legislature expected the pool of available signatories to be roughly twice as large as it currently stands, thereby reducing the required percentages by approximately half. After the district court struck down the Unaffiliated Voter Provision in the First Lawsuit, however, the pool of registered voters permitted to vote in a Republican primary election—the pool of available signatories for a Republican candidate—dropped by nearly 46% statewide as unaffiliated voters were no longer eligible to sign a candidate's petition. As of November 27, 2017, there were 603,195 registered unaffiliated voters in Utah, and 715,983 registered Republicans. Utah Lieutenant Governor Elections, *Voters by Party and Status*, www.elections.utah.gov/party-and-status (last visited 11/27/2017).

In a perfect example of why it is prudent for legislatures to use ratio requirements as opposed to absolute numbers, the burden imposed by the signature-gathering requirements varies widely from district to district. At the outset of this litigation, a candidate using the signature-gathering path to access the primary ballot for State Senate needed to collect signatures from between 6.21% of registered Republicans (in district 14) and 30.82% of registered Republicans (in district 1) depending on the district in which he or she was running. The numbers are even starker for the State House, where a candidate was required to collect signatures from between 7.14% (in district 27) and 57.2% (in district 26) of the registered Republicans in a given district.[21] The URP argues that these numbers are so high as to severely burden its right of association with potential candidates of its party and cannot be saved as reasonably calculated to serve a compelling state interest. Aplt. Br. at 42–45.

If the signature-gathering path stood alone we would be inclined to agree. Petition requirements are a constitutional method of serving a state's "legitimate interest in requiring a showing of a 'significant modicum of support'" before adding a candidate to an election ballot, Artunoff, 687 F.2d at 1378 (quoting Jenness, 403 U.S. at 442), but the Supreme Court has not yet approved a requirement greater than 5% of the registered voters in a given election. See Jenness, 403 U.S. at 438 (upholding a statute requiring a petition signed by 5% of eligible voters in order for

---

[21] These figures are drawn from the Record as it existed when the URP filed for summary judgment on this issue on February 2, 2016. See Aplt. App. 431–435.

an independent candidate to qualify for the general election ballot). We do not hold

that 5% is the outer-boundary of what can pass constitutional muster, but it is likely

the limit is at least visible from there. Where, as here, the regulation requires

signatures from over 50% of the eligible voters in some districts, we can conclude

that the State's legitimate interest in requiring a candidate to show a "modicum" of

support no longer outweighs the burden imposed on candidates, parties, and most of

all, voters, at least as to those districts.

However, when viewing the Utah Election Code in totality, See Artunoff, 687

F.2d at 1379, we are not convinced that the burdens imposed by the collection of

avenues Utah has created onto a primary ballot unconstitutionally burdens the URP's

First Amendment right of association.[22] First, the State has a significant interest in

regulating the manner in which a candidate may qualify for an election ballot.

> A state has a legitimate interest in requiring a showing of a "significant modicum of support" before it prints on the state election ballot the name of a political party and its slate of candidates. This serves the important state interest of avoiding "confusion, deception, and even frustration of the democratic process at the general election." Jenness v. Fortson, 403 U.S. 431, 442, (1971). Furthermore, the states "have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." Clements v. Fashing, 457 U.S. 957 (1982).

---

[22] Our analysis here is confined to the question of whether the Signature Requirement constitutes an unconstitutional burden on the URP. Because the litigants are political parties and not candidates, we do not address the burdens imposed on individual candidates.

<u>Artunoff</u>, 687 F.2d at 1378. This interest applies with equal force to primary elections as it does to general elections. <u>N.Y. State Bd. of Elections v. Lopez Torres</u>, 552 U.S. 196, 204 (2008) ("Just as States may require persons to demonstrate a significant modicum of support before allowing them access to the general-election ballot, lest it become unmanageable, they may similarly demand a minimum degree of support for candidate access to a primary ballot.") (internal citations and quotations omitted). Therefore, for <u>Anderson-Burdick</u> balancing purposes, these "important regulatory interests" will be sufficient to uphold SB54's Signature Requirements provided the burdens imposed by those requirements are less than severe. <u>See</u> <u>Clingman</u>, 544 U.S. at 586–87.

While the petition requirements standing alone would undoubtedly impose a severe burden as to some districts, we cannot find them burdensome on the party within the context of the electoral scheme as a whole. First, the signature-gathering path is only one possible avenue onto the primary election ballot, and all parties to this lawsuit concede the alternative—advancing from the party's caucus—both is constitutional and would be constitutional standing alone. Therefore, from the URP's perspective, the signature-gathering provision only "increases the opportunities to get on the ballot" thereby reducing the burden placed on the URP and other political parties. <u>See</u> <u>LaRouche</u>, 990 F.2d at 38.

Furthermore, over an objection from the URP, which tried to establish a dispute of material fact, the district court found that notwithstanding the loftiness of these requirements, the signature gathering path remained "a realistic means of ballot

37

access[.]" URP III, 177 F. Supp. 3d at 1369; see also id. at n.174 ("[T]he URP recognizes that there are at least some URP candidates who have successfully met the signature requirements to obtain access to the ballot."). This also weighs in favor of finding that the burden is less than severe.

Finally, we do recognize that some of these numbers—57%, in one particular house district—are eye-popping. Yet we are struck that the enormity of these figures says more about the compartmentalization of our current political landscape than it does the validity of SB54. The 57% figure comes from House District 26 which was one of only a handful of districts in Utah—an overwhelmingly Republican state—that is packed so full of Democratic voters that Republicans did not even bother fielding a candidate there in the most recent election. In 2014 the Republicans fielded a candidate, but that candidate received just 28% of the votes, compared to 72% for the Democratic candidate.[23]  According to data in the Record, in 2016 District 26 had 9,522 registered voters, just 18% of whom were registered Republicans. This in a state where 48% of the registered voters statewide were registered Republicans.

Against this backdrop, it is more likely these eye-popping numbers say more about modern political gerrymandering and segmentation than they about do the constitutionality of SB54. Whether by overt gerrymandering, a growing tendency of people to gravitate towards those who share their politics, or some combination of the

---

[23] Utah Lieutenant Governor Elections, Election Results, https://elections.utah.gov/election-resources/election-results, (last visited Nov. 27, 2017).

38

two, the percentages imposed by the Signature Requirement in several Utah districts is so high precisely because there are so many Democrats packed into those particular districts that the URP will never actually be able to capture that seat. Where the URP has no reasonable likelihood of fielding or electing a serious candidate in those districts with high percentage requirements of petition signatures, we cannot say the URP has suffered any real injury to its constitutional right of association when it was largely redistricting decisions that caused such anomalies.[24]

When we look at the state's electoral scheme in totality, including the retention of the caucus system as a method of qualifying a candidate for the primary ballot, we conclude that the Signature Requirement does not impose a severe burden on the URP's associational rights. Therefore we hold that Utah's legitimate interest in requiring a candidate to demonstrate a minimum degree of support in terms of gathering 1,000 or 2,000 signatures on a petition before being placed on the primary ballot for the State House or State Senate is sufficient to outweigh the provision's minimal burdens on the URP. Therefore we AFFIRM the district court's ruling that the challenged Signature Requirements do not constitute an unconstitutional burden on the URP.

### C.    The Utah Democratic Party

---

[24] Nonetheless, this lawsuit demonstrates why states would be prudent to use percentages, rather than absolute totals, when requiring candidates to obtain signatures in order to qualify for the ballot. That way, as voter populations ebb and flow and partisan compositions change district-by-district, the amount of support necessary to demonstrate viability remains the same. This is the traditional method, and one we strongly encourage states to adopt moving forward.

At the district court the Utah Democratic Party ("UDP") intervened as a plaintiff in part to "ensure [the State] appl[ies] the laws equally to all Utahns, no matter what political party, if any, they choose to join." Aplt. App. 99. The UDP—joined in this instance by the State—argues that the URP's arguments in this lawsuit are barred by the doctrines of claim preclusion, issue preclusion, and claim splitting based on the outcome of the First Lawsuit. Democrats Br. at 17–24; Aple. Br. at 47. Because we hold that the URP's constitutional claims fail, we have no reason to reach the merits of the UDP's cross-appeal from the district court's ruling that the URP's arguments were not so barred.[25]

Additionally, the UDP argues that the district court erred in invalidating portions of the URP's constitution and bylaws that conflict with SB54 as interpreted by the Utah Supreme Court and the district court. Democrats' Br. at 9–10. Specifically, the UDP takes issue with the district court's comment that the "stated URP intention to ban a member from nomination if that member fails to secure at least 40% of the delegate vote at convention is directly contrary to state law and is invalid." See URP IV, 178 F. Supp. 3d at 1184. The UDP argues that the district court was powerless to invalidate the URP's bylaws, and the choice of whether to comply with state law (and remain a QPP) or violate state law (and revert to RPP status) should be left with the URP. Democrats' Br. at 11–13. In other words, the

---

[25] In so doing we also express no opinion on the URP's claim that these arguments necessarily fail under Rule 28(i) and the "cross-appeal" rule. See Aplt. Reply at 25–27 (citing Fed. R. App. P. 28(i) and Bernstein v. Bankert, 733 F.3d 190, 224 (7th Cir. 2013)).

UDP argues that the district court should have invalidated the URP's status as a QPP rather than simply striking the offending provisions in the URP bylaws so the URP would remain a QPP.

This is essentially the exact question certified to the Utah Supreme Court by the district court earlier in this litigation. On April 8, 2016, the Utah Supreme Court addressed the following question, certified at the request of the UDP: "If a registered political party (RPP) that has selected to be designated as a Qualified Political Party (QPP) fails to satisfy the requirements of a QPP, must the Lieutenant Governor treat that political party as a RPP under Utah law?" Utah Republican Party v. Cox, 373 P.3d 1286, 1287 (Utah 2016). The Utah Supreme Court declined to answer that question, concluding that it was not yet ripe for review. Id. We agree.

Drawing its application both from "Article III limitations on judicial power" and "prudential reasons for refusing to exercise jurisdiction," Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 670 n.2 (2010), "[t]he ripeness doctrine aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication." Awad v. Ziriax, 670 F.3d 1111, 1124 (10th Cir. 2012) (internal quotations omitted). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580–81 (1985)). Prudential ripeness is traditionally considered through the two-prong test established in Abbot Labs v. Gardner, 387 U.S. 136, 149 (1967), under which courts assess (1) "the fitness of the

41

issues for judicial decision[,]" and (2) "the hardship to the parties of withholding court consideration." See, e.g., Fourth Corner Credit Union v. Fed. Reserve Bank of Kan. City, 861 F.3d 1052, 1059 (10th Cir. 2017) (Matheson, J., concurring) (quoting United States v. White, 244 F.3d 1199, 1202 (10th Cir. 2001)).

In declining to answer the certified question, the Utah Supreme Court noted that it was as yet unclear whether the URP, if it were to lose its challenge to SB54's constitutionality, would enforce its constitution and bylaws. Utah Republican Party, 373 P.3d at 1288 ("At present there are multiple options available to the Republican Party once this court's interpretation of the QPP statute is published, and it is not clearly established in the record which of those the party will choose."). In assessing the record before us, we find that nothing has changed in this respect. As the Utah Supreme Court observed, the URP has offered conflicting statements during the course of this litigation about its intention to comply with SB54. Compare id. at 1288 ("The Chairman of the Utah Republican Party sent a letter to the Lieutenant Governor in December 2015 declaring that 'it would restrict its candidate-selection procedures to the convention method, thereby prohibiting any URP candidate from gathering signatures.'") with id. at 1288–89 ("More recently, however, counsel for the Republican Party [stated that] 'if the state law says that we have to allow both routes and if that is what the Supreme Court decides and if we have elected to be a QPP, then we would have to figure a way how to change our constitution and by-laws to conform to the state law.'").

Against this backdrop, the doctrine of ripeness counsels that it is premature for this Court to determine the appropriate remedy should the URP flout the dictates of SB54. Considering first the "fitness of the issues for judicial decision," Abbott Labs, 387 U.S. at 149, we find that the UDP's cross-appeal is littered with uncertainty. Perhaps, following the conclusion of this lawsuit, the URP will expel members who choose to pursue the primary ballot through the signature-gathering process. Doing so would violate state law under the Utah Supreme Court's interpretation of the Either or Both provision, and the question of what remedy is appropriate would thus ripen for review. Perhaps the URP will decline to enforce its bylaws, in which case the UDP's claim of hardship would become moot.[26] Perhaps the URP will voluntarily amend its constitution and bylaws in response to this litigation prior to the 2018 election, which will again moot this question. Given this uncertainty, we cannot conclude that the issue of what remedy is appropriate when a political party's constitution and bylaws contravene state law is prudently fit at this time for judicial consideration before this court.[27]

---

[26] It is possible that if the URP leaves its bylaws and constitution intact but simply refuses to enforce them, there may be some hardship to individual candidates or the UDP by virtue of the chilling effect those bylaws would have on potential candidates. This issue was not raised by the parties, however, and thus we decline to address it. The UDP's claims were dismissed by the district court without prejudice, Aplt. App. 1203–04, thus if it would like to renew this claim of hardship at a later date, it is free to do so.

[27] The Court does take judicial notice of the fact that multiple Utah Republican candidates have qualified for primary election ballots using the signature-gathering method—including the current Republican Governor—and have not been expelled from the Party. See, e.g., Ben Winslow and Mark Green, *Gov. Gary Herbert forced*

As for the second prong, "the hardship to the parties of withholding court consideration," id., we do not find that the UDP will be significantly impaired by our decision here today. By declining to address the remedy of a violation which may never occur, we simply maintain the status quo. Accordingly, we find that the Democrats' alleged injury is not ripe for review.

### D.  URP Attorney Marcus Mumford

Finally we address the conduct of Mr. Marcus Mumford, an attorney for the URP. After he repeatedly missed deadlines at the Tenth Circuit, a panel of our colleagues took the extraordinary step of placing Mr. Mumford on notice that "the judges assigned to decide this appeal on the merits may wish to address in greater depth counsel's noncompliance with the court's rules." Utah Republican Party v. Cox, No. 16-4091, Order Granting Appellant's Motion to Accept Late Brief (Dec. 16, 2016).

Mr. Mumford triggered this notice through a series of procedural and timeliness violations in the submission of his opening brief. First, the brief did not satisfy this Court's rules, in that it did not state the opposing party's position on the relief requested as required by Tenth Circuit Rule 27.1. Second, Mr. Mumford failed to comply with Tenth Circuit Rule 31.5 by not providing this Court with hard copies of his brief within two business days of the brief having been filed electronically.

---

*into primary election with Jonathan Johnson*, FOX31 SALT LAKE CITY, (April 23, 2016) http://fox13now.com/2016/04/23/gov-gary-herbert-forced-into-primary-election-with-jonathan-johnson/ ("Because he gathered signatures under the "Count My Vote" compromise law, Herbert has a guaranteed spot on the ballot, despite failing to secure the convention nomination.").

Our colleagues—correctly, in our opinion—noted but did not linger on these errors. More troubling, however, was Mr. Mumford's repeated inability to file papers in a timely manner. Rather than paraphrase the extensive timeliness problems associated with this brief, we simply incorporate our colleagues' findings:

> The opening brief was originally due September 27, 2016. The appellant requested and was granted an extension of time to file the opening brief until October 27, 2016. The appellant then requested a 96-day extension of time to file the opening brief, or until January 31, 2017. At the direction of the court, the appellant was granted a portion of the requested extension. We allowed 30 additional days to file the opening brief, which pushed the filing deadline to November 28, 2016. The court advised that no additional extensions of time to file the opening brief would be granted.
> On November 28, 2016, the appellant electronically filed a four volume appendix. No opening brief was submitted with the appendix, however. Two days later, having received no opening brief, the court issued a deficiency notice to the appellant regarding the missing brief. The court *sua sponte* granted 10 additional days to file the opening brief. The opening brief was due December 12, 2016.
> With the additional time provided by operation of the deficiency notice and an intervening weekend, the appellant had *14 additional days* beyond the final extension deadline to file the opening brief. But even with all of this additional time, the appellant still did not file the opening brief on the due date. The brief was due December 12, 2016, but was not filed until the morning of December 13, 2016. Compounding the problem further is the fact that the [Motion to Accept Late Brief] was not filed until December 14, 2016, two days after the deadline set in the deficiency notice expired.

Utah Republican Party v. Cox, No. 16-4091, Order Granting Appellant's Motion to Accept Late Brief (Dec. 16, 2016). Notwithstanding these errors, our colleagues

45

tolerantly excused the untimely submission and granted the Motion to Accept Late Brief, albeit with the language regarding Mr. Mumford quoted above. Id.[28]

Like our colleagues, we are troubled by this pattern of untimeliness. If it were to continue in future appeals we might be forced to consider taking action against Mr. Mumford. While at this time we do not feel his conduct has risen to the level necessary to support such drastic sanctions, he would be well-served to approach his next foray into our courthouse with a keen attention to timeliness and detail.

## IV.    CONCLUSION

States must have flexibility to enact reasonable, common-sense regulations designed to provide order and legitimacy to the electoral process. SB54, as modified in the First Lawsuit, strikes an appropriate balance between protecting the interests of the state in managing elections and allowing the URP and all other political associations and individuals across Utah to express their preferences and values in a democratic fashion and to form associations as protected by the First Amendment to

---

[28] We also note that similar tardiness on Mr. Mumford's part in the First Lawsuit led that court to order Mr. Mumford to add co-counsel due to his "demonstrated inability to manage deadlines and because of his repeated failure to comply with court orders throughout this case[.]" Utah Republican Party v. Herbert, No. 2:14–CV–00876–DN–DBP, 2015 WL 6394534, at *7 (D. Utah Oct. 22, 2015).

46

the Constitution.[29]  Not only does this balance not offend our Constitution, it is at its

very essence.  Accordingly, we AFFIRM.

---

[29] Of course, our decision addresses only the issues presented to us.  We do not address the reach of governmental power to regulate other associational nominating decisions.

16-4091, *Utah Republican Party v. Cox*; 16-4098 *Utah Democratic Party v. Cox*.

**TYMKOVICH, C.J.,** concurring in part and dissenting in part.

American legal thought is famed for its focus on procedure. And there is good reason: as every first-year civil procedure student learns, substance and procedure frequently form a Gordian knot—impossible to disentangle.[1] This insight carries over into the Law of Democracy. One change to procedure can work a profound change to the substance of political parties, including which candidates they choose and what messages they communicate.

In this case, the Utah Republican Party claims that Utah's 2014 election law reforms purposely try to change the *substantive type* of candidates the Party nominates, all the while masquerading as mere *procedural* reform. If true, such a project would severely burden the Party's associational rights, and without compelling justifications, it would be unconstitutional.

Because that is exactly what Utah has tried to do and because Utah has not provided adequate justification for placing such a burden on the Party's associational rights, I would hold Utah's election law violates the First Amendment. Though I dissent for this reason, I concur with the majority that the number of signatures required by the law's signature-gathering provision does not violate the Constitution.

---

[1] *See* Paul MacMahon, *Proceduralism, Civil Justice, and American Legal Thought*, 34 U. Pa. J. Int'l L. 545, 594–610 (2013); *see also* Thurman W. Arnold, *The Role of Substantive Law and Procedure in the Legal Process*, 45 Harv. L. Rev. 617, 643 (1932).

# I. Background

The Utah Republican Party argues Utah's recent reforms violate its First Amendment associational rights. Utah's Lieutenant Governor contends Utah's legislation is well within the state's regulatory power over elections. To evaluate these claims, we must first look at what those reforms sought to accomplish.

## A. Utah Republican Party's Nomination Procedures

Before Utah passed legislation known as Senate Bill 54 in 2014, Utah election law gave political parties freedom to choose how they would nominate candidates for the general election. Parties could choose whether or not to use the state's primary election mechanism.

With that freedom, the Utah Republican Party chose not to use the primary as its principal means of selecting candidates. Instead, the Party had, and continues to employ, a carefully crafted convention process. Party members in defined precincts conduct neighborhood caucus meetings. In accordance with the Republican Party's bylaws, each caucus meeting is open to the public and begins with prayer, a recitation of the pledge of allegiance, and a reading of the Party's platform. The caucus attendees in turn select community representatives to serve as delegates to the Party's convention, where nominees will eventually be considered and selected.

The Party's nominating conventions are also open to the public. After candidates or their representatives make nomination speeches, delegates cast their

2

votes for candidates to each office. If a candidate obtains sixty percent of the vote, he or she becomes the Party's nominee for that office in the general election. If there are more than two aspiring candidates for a given office, ballots are conducted until there are only two remaining candidates or until a candidate gains sixty percent of the vote. And if there are two candidates left and neither has obtained sixty percent of the vote, the candidates participate in a primary election run by the state. This means the Party uses the primary election mechanism only when no candidate for a contested office could obtain sixty percent of the delegates' vote. In other words, a consensus convention nominee with sixty percent of the convention vote gets the nomination—leaving no room for a party challenger by other means.[2]

The Republican Party claims it has developed this convention-based nomination process over the years to ensure the selection of nominees who will best represent the Party's platform. Because a maximum of two candidates ever participate in a primary election for a given office, these procedures also

---

[2] This did not mean the Party never participated in state-run primaries. From 2002 to 2010, a number of state house and senate districts participated in a Republican primary during each primary election cycle. *See* Utah Lieutenant Governor's Office, *Election Results*, https://elections.utah.gov/election-resources/election-results (last visited Feb. 21, 2018). Nor did it mean conventions were an incumbent-protection machine. *See* David Catanese, *Sen. Bennett loses GOP Nomination*, Politico (May 10, 2010), https://www.politico.com/story/2010/05/sen-bennett-loses-gop-nomination-036960 (noting how outsiders beat incumbent Senator at the Party's convention to gain spots on primary ballot).

guarantee that nominees chosen through a state-run primary will have obtained a majority (and not just a plurality) of party members' votes.

The Party's candidate qualification requirements, like its nomination procedures, are designed to make certain that nominees are committed to the Party's platform. All candidates must file a statement certifying that they do not hold a position in any other political party. They must also certify they have read the Party's platform and accept it as the standard by which their performance as an officeholder will be evaluated. Candidates must file these certifications at least thirty days before the convention. If they do not, the Party Chairman announces this failure before the delegates vote.

As an additional security measure against the possibility of unfaithful nominees, the Party's bylaws require nominees to certify they will abide by the Party's nomination procedures. These procedures do not allow for any method to gain the nomination other than competition in the Party's convention.

### B. Senate Bill 54

The events leading up to this case began in 2013. According to the Party, and uncontested by Utah, a bipartisan group registered as the Utah Political Issues Committee Alliance for Good Government, but known popularly as Count My Vote, began lobbying the Party to change its nomination procedures. The group believed the convention method gave "the most power and influence to those with the most extreme views," presumably because only the most fervent and eager

4

undertake the inconvenience of attending a caucus meeting.[3]  In its view, this "extremism" was pernicious because the Republican Party is presently the dominant party in Utah and its nominees are favored to win many district- and state-wide elections in the general elections.

To confront this perceived problem with the Republican Party's nominees, or in other words, to "require political party nominees to show a sufficiently broad level of support in order to appear on the general election ballot,"[4] the group repeatedly asked the Party to change its nomination rules.  If the Party did not comply, the group threatened to bring a ballot initiative to change the Party's nomination rules against its will.  Specifically, it wanted the party to accept absentee votes at conventions and increase the number of votes required for candidates to secure the nomination at a convention.  This way, contested nominations would more often be decided with a primary election.

The Republican Party refused.  Undaunted, Count My Vote registered its initiative and began efforts to persuade the Utah legislature to enact its desired reforms.

The result was Senate Bill 54.  Enacted in 2014, it completely overhauled the requirements political parties must meet to have their nominees placed on

---

[3] *See* Count My Vote, *Why Change Utah's Election System?*, http://www.countmyvoteutah.org/facts (last visited Feb. 21, 2018).

[4] *See* Count My Vote, Citizens' Initiative Petition 4–5 (2013), http://www.countmyvoteutah.org/s/Submitted-Initiative-Application-duv3.pdf.

Utah's general election ballot. No longer are parties free to select their nomination procedures. "Each registered political party that chooses to have the names of the registered political party's candidates for elective office featured with party affiliation on the ballot at a regular general election," the bill provides, "shall nominate the registered political party's candidates for elective office in the manner described in this section." Utah Code Ann. § 20A-9-403(1)(b).

The bill creates two possible paths for political parties to earn the right to place their endorsements on the ballot—they can be "registered political parties" or "qualified political parties." For registered political parties, participation in the primary is mandatory. "Each registered political party" must "either declare the registered political party's intent to participate in the next regular primary election" or declare that it chooses "not to have the names of the registered political party's candidates for elective office featured on the ballot at the next regular general election." § 20A-9-403(2)(a).

To earn a place on the primary ballot, candidates for a registered political party have one choice only: to collect nomination petitions from "at least 2% of the registered political party's members who reside in the political division" for the office sought. § 20A-9-403(3)(a).

A "qualified political party," by contrast, is allowed to use a convention to select nominees. But this comes at a cost. Qualified political parties must permit delegates to vote by absentee ballot. And they must allow members to seek

6

nomination *either* by using the party's convention *or* by collecting a statutorily-designated number of signatures (which varies by office), *or* both. § 20A-9-101. This is called the "Either or Both" provision.

Whenever there is at least one candidate chosen by convention and at least one who gained candidacy for the same office by collecting signatures, a qualified political party must participate in a primary election to choose between them. The same is true when there are two or more persons who gained candidacy for the same office by collecting signatures. § 20A-9-409(2). Unlike registered political parties, then, qualified political parties do not necessarily have to participate in the primary election. They only must do so when there are persons who gathered signatures to become candidates.

Candidates who obtain "the highest number of votes" in the primary election, regardless of whether they gained candidacy by convention or signature collection, are deemed "nominated for that office by the candidate's registered political party." § 20A-9-403(5)(a). Parties cannot opt out of this scheme while still retaining their ability to list their affiliation with candidates on the ballot.

And that was not all. As originally passed, Senate Bill 54 also required qualified political parties to allow voters unaffiliated with any party to sign nomination petitions and vote in the party's primary election.

## C. The Lawsuits

In 2015, the Utah Republican Party filed suit against Utah's Lieutenant Governor to enjoin the law's application to the Party. The Party concentrated its arguments on the provision requiring it to allow unaffiliated voters to vote in its primary and sign nomination petitions. The district court in Utah held that provision unconstitutional because it unduly burdened the Utah Republican Party's associational rights. *Utah Republican Party v. Herbert*, 144 F. Supp. 3d 1263, 1278 (D. Utah 2015). That judgment is not before us.[5]

The subject of this appeal is the Utah Republican Party's second as-applied challenge to Senate Bill 54. After the first suit, the Party sought clarification from Utah's Lieutenant Governor on whether he would uphold the Party's objections against any candidate who obtained a spot on the primary ballot by using the signature gathering method, which the Party's bylaws did not allow. The Lieutenant Governor responded that his office would not uphold objections to candidates solely because they used the signature-gathering method to gain candidacy. State law, the Lieutenant Governor said, required the Party to allow members to use the signature collection method to become a nominee.

---

[5] The Utah Republican Party argues judicial estoppel prevents Utah from asserting its interpretation of the Either or Both provision in this case. But a review of the record unambiguously demonstrates that Utah's position in the first lawsuit is not at odds with its position in this case. *See* JA 1143.

8

In early 2016, the Party again filed suit, arguing, among other things, that Senate Bill 54 was unconstitutional as applied to the Party because it (1) required the Party to participate in a primary election; (2) required the Party to accept candidates who gathered signatures, in violation of its bylaws; and (3) required an unconstitutionally burdensome number of signatures for qualified political party members to become State House or Senate candidates in the primary.

Upon certification from the district court, the Utah Supreme Court interpreted the Either or Both provision and agreed with the Lieutenant Governor: the law requires the Party to allow members to become nominees by collecting signatures.[6]

On motions for summary judgment and judgment on the pleadings, the district court entered summary judgment for Utah on all claims, holding the burden these provisions placed on the Republican Party's associational rights was not severe and that the state's interests were substantial enough to justify what little burden existed. The Utah Republican Party has appealed every claim.[7]

---

[6] *Utah Republican Party v. Cox*, 373 P.3d 1286, 1287 (2016). The Utah Supreme Court declined to address what the consequences would be if the Republican Party disobeyed Senate Bill 54 by, for example, expelling a member who used the signature collection route to candidacy. *Id.* at 1288–89.

[7] The Utah Democratic Party—which intervened below—also cross-appealed on various grounds, but it cannot do so because it voluntarily dismissed its claims below. *Coffey v. Whirlpool Corp.*, 591 F.2d 618, 620 (10th Cir. 1979).

9

I dissent because I believe the Party is correct that, in the circumstances of this case, Utah's interference in the Party's nomination process was unconstitutional. At a minimum, the majority is wrong to conclude Senate Bill 54 is clearly constitutional on this record. There is at least a material dispute of fact as to the burden on the Party's rights and the sufficiency of the state's interests. I concur with the majority that, if Senate Bill 54 is otherwise constitutional, the number of signatures required for State House and Senate candidacies is not unconstitutional.[8]

## II. Analysis

The election context is, like so many areas covered by the First Amendment, one of competing rights. And like many situations in which two constitutional principles come head to head, the touchstone of a court's analysis is balancing.

---

[8] Utah argues (by incorporating the Utah Democratic Party's argument) that the Utah Republican Party's claims are barred by issue preclusion, claim-splitting, and claim preclusion because of its first lawsuit. After carefully reviewing the record, it appears only the claim preclusion argument can possibly have merit. It is clear from the record that claim preclusion does not apply to the Republican Party's claims against the Either or Both provision or the signature-gathering provision. JA 582, 584–85. But the Republican Party's first lawsuit did squarely bring up a discriminatory animus claim. *See* JA 57–60, 77–78. And the Party had all the information it needed to make that claim at that time. Consequently, the Party's discriminatory animus claim is barred by claim preclusion. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017). Although we normally disfavor incorporation by reference, *cf.* 10th Cir. R. App. P. 28.4, I would hold the district court erred by not so deciding.

10

## A. Legal Framework

"A political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform." *N.Y. Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 202 (2008) (citations omitted) (approving convention nomination process). Indeed, the First Amendment affords "special protection" to "the process by which a political party selects a standard bearer who best represents the party's ideologies and preferences." *California Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) (internal quotation marks and citation omitted; alterations incorporated) (striking down blanket primary law). And this makes sense, as the nomination process is one that "often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." *Id.*

At the same time, the Constitution explicitly grants states power to select the "Times, Places and Manner of holding Elections for Senators and Representatives," U.S. Const. art. I, § 4, cl. 1, and this power is "matched by state control over the election process for state offices." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986) (striking down closed primary scheme).

Our evaluation of First Amendment challenges to state election laws attempts to account for these dueling interests. We "must first consider the

11

character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). We "then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.*

In balancing these considerations, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). When "rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* (internal quotation marks and citation omitted). "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (internal quotation marks and citation omitted).

Put more simply, if the burden on a Party's rights is severe, the state must have compelling interests in the regulation and the regulation must be narrowly drawn to protect those interests. But if the burden is a slight one, important state interests will do. So in this case, we must first consider the magnitude of the law's burden on the Republican Party's associational rights. We then look to whether the state's interests justify that burden. Because we are reviewing a

12

grant of summary judgment as well as a constitutional challenge to a statute, our review is de novo. *Ball v. Renner*, 54 F.3d 664, 665 (10th Cir. 1995); *United States v. Ramos*, 695 F.3d 1035, 1045 (10th Cir. 2012).

### B. The Mandatory Primary and Either or Both Provision

#### 1. The Mandatory Primary provision and the Either or Both provision must be evaluated together.

The Utah Republican Party elaborates separate arguments against (1) the requirement that it participate in a primary to choose between signature-collecting candidates and convention candidates (what it calls the "mandatory primary"), and (2) the requirement that it allow members to become primary election candidates by collecting signatures. But the distinction between the two provisions has little relevance for the purposes of this analysis.

In this as-applied challenge, we evaluate only the provisions that apply to the Utah Republican Party. Here, those are the provisions related to qualified political parties, not registered political parties. While Senate Bill 54 requires registered political parties to participate in the primary, it does not mandate participation of qualified political parties in every case. Instead, qualified political parties only have to participate in the primary when they must decide (1) between signature-gathering candidates and convention-chosen candidates, or (2) between two signature-gathering candidates. *See* Utah Code Ann. § 20A-9-409(2). If a party's only candidates for an office are chosen at its convention, the

party "may, but is not required to, participate in the primary election for that office." *Id.* For qualified political parties, then, the requirement to participate in the primary only exists when the signature-gathering path to nomination is used.

In short, the two provisions work as one and cannot be evaluated separately. The question is not whether each provision, in isolation, is constitutional. It is whether this scheme, as a whole, imposes a severe burden on political parties' associational rights, and if so, whether Utah has presented interests compelling enough to justify that burden.

### 2. The Burden

First, we analyze the burden. Senate Bill 54's effects are further confirmation of the truism that procedure can have enormous substantive repercussions. Not only does the law interfere with the Utah Republican Party's internal procedures, but it also changes the types of nominees the Party will produce and gives unwanted candidates a path to the Party's nomination. By doing so, Senate Bill 54 will inevitably cause divisiveness within the Party and reduce candidate loyalty to the Party's policies. Put together, these consequences severely burden the Party's ability to choose a loyal nominee and, ultimately, its right to define itself and its message. I explain each of these effects in turn.

To begin, Senate Bill 54 "substitute[s]" the Utah legislature's "judgment for that of the party as to the desirability of a particular internal party structure." *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 233 (1989).

14

The law is, in effect, a sort of state-created majority veto over the candidates a party selects through its carefully crafted convention process. And it gives aspiring candidates license to ignore a party's chosen convention procedures without ever having to convince other members to vote to change those procedures.

Such changes to a group's internal nominee selection process affect a group's ability to define itself. That is to say, they change the group's *substance*. Consider as illustration a Catholic parish. Imagine a situation in which parishioners could collect signatures to challenge their formally selected priest in a congregational election. Would not something substantive about the church have changed? Some might call this procedural reform. But it is more like a Reformation. And the profound importance of leadership selection is not limited to the religious context. Every group's leadership-selection procedures help define its substance—whether hierarchical, uber-democratic, or a mix. This defining choice is, constitutionally, up to each group, unless important state interests are at stake.

Here, the possibility Senate Bill 54 will substantively alter the Utah Republican Party's character is not mere speculation. It is very real. The Utah Republican Party's neighborhood caucus meetings are a communitarian affair—with shared prayer, competition for delegate slots, and local electioneering in support or opposition to candidates and platform

15

recommendations.  Under Senate Bill 54, candidates can evade the scrutiny of delegates chosen at these meetings, ignoring the caucus system altogether.  In effect, the new procedures transform the Party from a tight-knit community that chooses candidates deliberatively to a loosely affiliated collection of individuals who cast votes on a Tuesday in June.  *Cf. generally* David P. Redlawsk et al., *Why Iowa?: How Caucuses and Sequential Elections Improve the Presidential Nominating Process* (2010) (arguing that compared to a primary system, the Iowa Caucus encourages greater candidate interaction with voters as opposed to impersonal campaign advertising).

Second, Senate Bill 54 will likely change the types of candidates the Party nominates.  That was precisely the purpose of the law's promoter, Count My Vote.[9]  A nomination process filtered through a convention of party regulars will generate different candidates than one accomplished by polling the crowds, among whom are many persons who only nominally associate with the Party.  Count My Vote understood that.  So does the Party.  Whether it makes candidates more moderate, as Count My Vote would have it, or allows for more extreme candidates divorced from the influence of party leadership, the signature-

---

[9] *See, e.g.*, JA 57–59; Count My Vote, *Public Hearing Presentation*, http://www.countmyvoteutah.org/public-hearing-presentation (last visited Feb. 21, 2018) (Arguing the caucus system made "candidates more extreme, and amplified non-competitive elections"); *id.* ("Delegate Priorities Don't Represent Utah Voters").

gathering path to nomination will produce "nominees and nominee positions other than those the part[y] would choose if left to [its] own devices." *See California Democratic Party v. Jones*, 530 U.S. 567, 582 (2000).[10]

Third, the law violates the Party's right *not* to associate with an unwanted candidate, a "corollary of [its] right to associate." *Id.* at 574. "In no area is the political association's right to exclude more important than in the process of selecting its nominee." *Id.* at 575. Yet under this regime, a person who collects signatures can be named the Party's nominee in spite of the fact that he or she has broken the Party's rules regarding how to seek the nomination.

What is more, this scheme allows nominal members or even members hostile to the Party's policies to hijack the Party's platform. So long as a person has means (by fame or fortune) to obtain the requisite number of signatures, he or she can challenge the Party's chosen convention candidate in a primary election. This is no small burden on the Party's right of dissociation, for the spoils of winning the primary are not just a place on the general election ballot (which can be obtained as an unaffiliated candidate). The spoils are a place *as the Party's nominee*.

---

[10] As I discuss further below, there is no reason to believe that grass roots, insurgent candidates are more likely to be the more centrist nominee. One only need look around at a few recent elections at every level to know that claim is dubious.

17

As even counsel for the Utah Democratic Party admitted at oral argument, that presents a "[*California Democratic Party v.*] *Jones* problem,"[11] because it is the kind of violation of the freedom not to associate that the Supreme Court condemned in *Jones*, 530 U.S. 567 (2000). In that case, California enacted a partisan blanket primary in which all voters, regardless of party affiliation, could vote for any party's nominees. *Id.* at 569–70. The Court held that scheme unconstitutional in part because it created the possibility parties would be "saddled with an unwanted, and possibly antithetical, nominee." *Id.* at 579–81. Forcing the Party to accept nominees who circumvent the Party's chosen nomination method by appealing to members at the fringes of the Party accomplishes the same thing. It can "saddle" the Party with a nominee who is "antithetical" to the integrity of the Party and its long-term message.

Fourth, this law is likely to cause divisiveness within the Party's ranks. It does not require much foresight to predict that a face-off between a Party's chosen convention candidate and a signature-gathering insurgent will create rifts among the Party's members. *See* Paul Pennings & Reuven Y. Hazan, *Democratizing Candidate Selection: Causes and Consequences*, 7 Party Politics 267, 271 (2001) (discussing this effect for primaries). Fueling intra-party strife

---

[11]Oral Argument at 16:40–17:45.

endangers an association's very existence almost as much as the inability to exclude. Neither houses divided nor houses without walls can stand.

Fifth, Senate Bill 54 may undermine "the loyalty of candidates to party policies" by "putting candidates in a more independent position vis-à-vis the party and its leadership." *Id.* "[W]hen their nomination depends on the general electorate rather than on the party faithful," it is less likely that "party nominees will be equally observant of internal party procedures and equally respectful of party discipline." *Jones*, 530 U.S. at 581. The same logic applies here.

While only party members can vote in the party's primary, not all members are the same. As the Supreme Court recognized, "the act of formal enrollment or public affiliation with the Party is merely one element in the continuum of participation in Party affairs, and need not be in any sense the most important." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 215 (1986). Senate Bill 54 forces the Party to include people who only marginally identify with the party in its nomination decisions. This change will lessen candidates' loyalty to the Party relative to the Party's preferred convention process. A candidate may still formally have to certify agreement with the Party's policies, but faithful delegates are no longer able to hold rogue candidates accountable. And because more than two candidates may end up running in the primary election and split the vote, a person can gain the nomination without a majority of the vote—intensifying the risk that a nominee will be disloyal to the Party platform.

19

In sum, then, Senate Bill 54 interferes with the Party's internal procedures, changes the kinds of nominees the Party produces (is, in fact, meant to do so[12]), allows unwanted candidates to obtain the Party nomination, causes divisiveness within the Party, and reduces the loyalty of candidates to the Party's policies. When an association grows large, the risk the association's central message will be lost amidst a sea of nominal members grows too—especially if the group must maintain an inclusive membership policy. Many organizations respond by leaving membership relatively open, but restricting leadership to those who are "true believers," so to speak, in the group's mission. That is what the Party has tried to do. At core, Senate Bill 54's sin lies in taking this option away. In so doing, the law constrains the Party's ability to carry out its most central associational mission—its selection of a faithful nominee.

In spite of the foregoing burdens, the majority opinion concludes the law's overall burden on the Party's associational rights is light. The majority bases this conclusion on five main reasons: (1) its conclusion the law does not regulate the Party's internal process, (2) the Party's continued ability to use traditional

---

[12] *See* Count My Vote, *Why Change Utah's Election System?*, http://www.countmyvoteutah.org/facts (last visited Feb. 21, 2018) (arguing the convention system gives "the most power and influence to those with the most extreme views"); Senate Day 24, 2014 53:00–60:00, http://le.utah.gov/jsp/jdisplay/billaudio.jsp?sess=2014GS&bill=sb0054&Headers=true (last visited Feb. 22, 2018) (Senator Bramble stating that Senate Bill 54 addressed Count My Vote's concerns and attempted to increase "competitive races between competing philosophies" in state primaries).

advertising channels to endorse the candidate of its choice, (3) the fact the Party's members still get to choose the nominee, (4) states' ability to regulate "the scope" of party primaries, Maj. Op. at 18, and (5) the Supreme Court's dicta on the power of states to mandate primaries. Since the Supreme Court's dicta relates to both the Party's burden and Utah's interest, I will address its continued vitality after I discuss the relevant state interests. As for the other reasons, I respectfully suggest they are mistaken.

To begin, the majority holds Senate Bill 54 does not "regulate the party's internal process" because "in fact its grand compromise was to maintain the [Party's] traditional caucus system as a path onto the primary ballot." Maj. Op. at 19. Yet this observation misses the point. The problem is not that the Party cannot use the caucus system at all. The problem is that the Party cannot use the caucus system as its exclusive means of nomination while still being able to list its endorsements on the ballot. The law requires the Party to allow members to either force a primary race or participate in one by collecting signatures. It is confounding to maintain that such a change does not "regulate the party's internal process."[13]

_____

[13] Because Senate Bill 54 was born of a "Great Compromise" between Count My Vote and a mostly Republican legislature, the majority also suggests the law actually helps the Party. Maj. Op. at 25 n.15. But why should it matter the bill was a compromise the Utah legislature entered into to avoid a ballot initiative? Whether or not the legislature was trying "to save the [Party] from undertaking a course of conduct destructive of its own interests"—which in any

Next, the majority, like the district court, argues the Party's freedom not to associate with unwanted candidates is sufficiently protected because the Party's leadership can publicly disavow signature-gathering candidates. That cannot be correct. Imagine a political party chooses a "legislator of the month" and gives Senator Sally a badge. Now imagine the government confers that title to Bob as well, and gives him an identical badge. It cannot be the case the party's associational rights have not been trampled upon simply because the party can just tell people that Bob is not the "real" legislator of the month. If that were true, not much would be left of the right not to associate.

In *Jones*, the "ability of the party leadership to endorse a candidate" did not lessen the burden on "party members' ability to choose their own nominee." 530 U.S. at 580. So too, the ability to publicly disavow a candidate does not alleviate the forced association imposed on the Party here. Persons who gather signatures are listed as *the Party's* candidates in *the Party's* primary ballot and can become *the Party's* nominee in the general election ballot—all in contravention of the Party's express rules. The ability to publicly deny those candidates is no solution. Indeed, tactical considerations will seriously constrain that ability in

event the state is not allowed to do, *Tashjian*, 479 U.S. at 224—Senate Bill 54 coerces the Party just as much as an initiative would have. And, more to the point, the Party and the Republican members of Utah's legislature are not entirely the same thing or necessarily aligned on every issue.

22

practice: the denounced candidate may end up the Party's only nominee in the general election.

The majority further suggests, again like the district court, that there can be no severe burden on the Party so long as nominees are ultimately chosen by the Party's members. The majority argues we must "define the association with the requisite specificity" and proceeds to define the Party as a collection of "roughly 600,000 registered Republicans." Maj. Op. at 20-22. Because Senate Bill 54 still permits those party members to choose the nominee, the majority concludes the burden is minimal.

There are two problems with this theory. First, it assumes that nothing of substance changes when nomination is transferred from the party's established convention-based system to a large-scale vote by its members. The error of this line of reasoning has already been explained. Nomination procedures can be substantive, and we err if we consider such a change immaterial.

Second, in order to hold that all is well so long as Party members choose the nominee, the majority defines political parties as merely a collection of members. That is wrong. A political party is more than the sum of its members. Political science literature has long observed parties have several components, only one of which is their membership. *See, e.g.*, Nathaniel Persily & Bruce E. Cain, *The Legal Status of Political Parties: A Reassessment of Competing Paradigms*, 100 Colum. L. Rev. 775, 778 (2000) (describing the distinction

23

between the "party-in-the-electorate," the "party-in-the-government," and "professional political workers"). Parties therefore have associational rights that are distinct from those of the individuals that form its membership. The superstructure of the party—its bylaws, customs, and leadership—are protected by the First Amendment too.

If this were not true, then states would have plenary power to alter the internal regulations of political parties, so long as they left ultimate nomination decisions up to party membership. But the Supreme Court has already rejected that theory. It has held that "[f]reedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders" and that "a State cannot substitute its judgment for that of the party as to the desirability of a particular internal party structure." *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 229, 232–33 (1989). And, contrary to the majority's suggestion, these rights are not cabined to "internal activity." *See* Maj. Op. at 14. They extend to a party's choice of nominee too. *Tashjian* dealt with what the majority might call the "external activity" of nomination, and yet the Court still explained that a "Party's determination of the boundaries of its own association, *and of the structure which best allows it to pursue its political goals*, is protected by the Constitution." 479 U.S. at 224 (emphasis added).

What is more, the Supreme Court routinely distinguishes between "the rights of political parties" and those of "their members." *See Eu v. San Francisco*

24

*Cty. Democratic Cent. Comm.*, 489 U.S. 214, 219, 231, 232, 233 (1989); *id.* at

229 ("These laws directly implicate the associational rights of political parties

*and their members*" (emphasis added)); *Tashjian*, 479 U.S. at 217 (evaluating "the

burden cast by the statute upon the associational rights of the Party *and its*

*members*" (emphasis added)); *Timmons*, 520 U.S. at 363 (the statute did not

"restrict the ability of the New Party *and its members* to endorse . . ." (emphasis

added)); *Jones*, 530 U.S. at 581 ("the ability of the party leadership to endorse a

candidate does not assist the party rank and file, who may not themselves agree

with the party leadership, but do not want the party's choice decided by

outsiders").

 In *Jones*, it is true, the Supreme Court specifically emphasized the fact that

party members could not choose nominees. *Id.* But the Supreme Court did not

thereby hold that a party is only defined by its members. In fact, that case was

brought because party *leadership and bylaws* allowed only party members, and

not non-members, to choose the nominee.[14]

 Lastly, the majority claims Senate Bill 54 does not unduly burden the Party

because it only regulates the "*scope* of a party primary." *See* Maj. Op. at 18

---

 [14] This conclusion does not entail, as the majority suggests, holding that "the rights and interests of the association extend only to the rights and interests of the party leadership." *See* Maj. Op. at 22. It merely entails an acknowledgment that the First Amendment protects the rights of a political party's superstructure *as well as* the rights of party members.

25

(emphasis in original). It is unclear what is meant by the "scope" of a primary, but *Clingman v. Beaver*, cited as support for this proposition, only holds that states can restrict the pool of voters who can vote in a state-run primary to a party's members and Independents. 544 U.S. 581, 590 (2005). The reasons for that holding—most saliently that "a voter who is unwilling to disaffiliate from another party to vote in [a party's] primary forms little 'association' with the [party]—nor the [party] with him"—are wholly absent in this case. *See id.* at 589. And nothing in *Clingman*'s holding suggests the State has carte blanche authority to reshape a Party's nomination procedures. Indeed, even the state's authority to limit the voter pool for a state-run primary is limited. The Supreme Court has held parties have a First Amendment right to include unaffiliated voters in their party primaries. *Tashjian*, 479 U.S. at 210–11.

In addition to the reasons the majority provides, the district court proffered one more: Senate Bill 54 does not substantially restrict the Party's associational rights because the Party is not required to become a qualified political party. In other words, the Party can operate as an unregistered political party, using whatever nomination procedures it wants. The only cost, the district court noted, would be to forfeit the ability to have its endorsements printed on the ballot. And because the Supreme Court has said the "First Amendment does not give political parties a right to have their nominees designated as such on the ballot,"

26

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 453 n.7 (2008), the district court concluded there was little, if any, burden.

But the district court down-played that even while there may not be a constitutional right to have endorsements printed on the ballot, the "unconstitutional conditions doctrine holds that the government may not deny a benefit to a person on a basis that infringes his . . . freedom of speech" or association "even if he has no entitlement to that benefit." *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (internal quotation marks and citation omitted). For if "the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which it could not command directly." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996) (internal quotation marks and citation omitted).[15]

Even though the Party may not have a right to place its endorsement on the ballot, Utah's condition on printing that endorsement—"change your party rules to better accommodate our preferred kinds of nominees or else lose your spot on the ballot"—is not a constitutional one. And given the marked electoral disadvantage for the party to go its own way, this condition may even be coercive.

---

[15] Though the Party has not expressly argued the unconstitutional conditions doctrine, the doctrine's applicability is obvious from the record.

27

The fact that the Party has the choice of being an unregistered political party, then, does not eliminate the law's serious restriction of its First Amendment freedoms.[16]

At bottom, then, none of the reasons either the majority or the district court provide rebut the conclusion that the Party bears a heavy burden under Senate Bill 54. Just because Senate Bill 54 does not engage in what the majority considers more serious intrusions (like a ban on endorsements or forcing the Party to accept nonmember voters in the primary) does not mean the burdens it *does* impose are not substantial. As the Supreme Court said about the law in *Jones*, Senate Bill 54 forces the Republican Party "to adulterate [its] candidate-selection process—a political party's basic function." *See Jones,* 530 U.S. at 568. When a State forces a party to radically change its candidate selection procedures in the way Utah does here, it places a severe associational burden on that party.

### 3. *State Interests*

Having concluded Senate Bill 54 severely burdens the Utah Republican Party's associational rights, we must determine whether Senate Bill 54 is "narrowly tailored to serve a compelling state interest." *Clingman v. Beaver*, 544

---

[16] The district court also concluded that because the Utah Republican Party's bylaws do not *expressly* prohibit signature gathering, Senate Bill 54 did not much burden the Party. But this is an unreasonable interpretation of the Party's bylaws, which provide for one means of nomination and one only: the convention. Thus, when the Party asked candidates to comply with its written procedures, it necessarily excluded other paths to the nomination.

U.S. 581, 586 (2005). "In passing judgment" on whether the state's interests are sufficient to justify its regulation, "the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it *necessary* to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (emphasis added).[17]

In its brief, Utah barely made mention of interests that justify Senate Bill 54. In a single sentence, it listed "managing elections in a controlled manner, increasing voter participation, and increasing access to the ballot"—almost like an afterthought. *See* Aple. Br. at 34. And at oral argument, Utah simply said the State's purpose was to "strengthen democracy."[18]

Perhaps Utah thought that gesticulating at buzz-words such as "democracy" and "voter participation" would insulate the sufficiency of its interests from scrutiny. It does not. In the context of this case, Utah's three purported interests are insufficient, if not illegitimate.[19]

---

[17] As the following discussion makes clear, I find Senate Bill 54 unconstitutional even under the more lenient *Anderson/Burdick* balancing test.

[18] Oral Argument at 34:10.

[19] The majority cites several Supreme Court cases upholding similar state interests. *See* Maj. Op. at 26. But none of those cases accepted the state interests without an in-depth exploration of their reasonableness in the case at hand. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191–97 (2008) (engaging in in-depth analysis of the state's proffered interests); *Clingman v. Beaver*, 544 U.S. 581, 593–97 (2005) (same); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364–68 (1997) (same).

29

The first in its parade of highly generalized interests—"managing elections in a controlled manner"—is almost too nondescript an interest to analyze. Utah has not claimed that elections were conducted in an "uncontrolled manner" before Senate Bill 54. Nor has it explained why the law increases the "controlled manner" of elections now. This appears instead to be a way of saying it has an interest in election regulation in general. But the state's power to regulate elections "does not justify, without more, the abridgment of fundamental rights, such as . . . the freedom of political association." *Tashjian*, 479 U.S. at 217.

Utah's second asserted interest fares worse. Not only is it insufficient; it is likely impermissible. In *Jones*, the Supreme Court held that while "increasing voter participation" is not "automatically" an illegitimate interest, courts must not evaluate that interest "in the abstract." 530 U.S. at 584. Instead, courts should ask how that value is being pursued. *Id.* The *Jones* Court therefore looked behind this generically phrased interest and found it lacking. In "the circumstances of [that] case," the state's reason for thinking the law would increase voter participation was that "more choices favored by the majority [but not by the party] will produce more voters." *Id.* at 584–85. That was "hardly a compelling state interest," the Court explained, "if indeed it [was] even a legitimate one." *Id.* It is one thing to protect the right to vote; it is quite another to lecture political parties because their internal processes turn off average voters. It is for elections to disclose the truth of that.

30

Though the state has not explained why it thinks Senate Bill 54 will increase voter participation, there are reasons to think Utah's asserted interest in "increasing voter participation" suffers from the same flaw as that in *Jones*. As recounted earlier, the advocacy group Count My Vote spearheaded the passage of this legislation, and its express purpose was to change the Party's nomination practices so that nominees would be more representative of the majority of general election voters. It believed "[p]arty delegates . . . do not represent the views of average Utahns."[20]

It is uncontested that Senate Bill 54 was designed to accomplish Count My Vote's goals. At oral argument, Utah's counsel admitted that Senate Bill 54 was a "compromise" enacted to address the concerns of the Count My Vote movement.[21] As the majority explained, "it is clear from our review of the record

---

[20] *See* Count My Vote, *Why Change Utah's Election System?*, http://www.countmyvoteutah.org/facts (last visited Feb. 21, 2018); *see also* Count My Vote, *Press Release: Education Groups Endorse, Rally Behind Count My Vote*, http://www.countmyvoteutah.org/education-community -endorses-rallies-behind-count-my-vote (last visited Feb. 21, 2018) (publicizing another group's endorsement, stating that "The majority of all Utah voters rank education as their highest priority, but Republican delegates are more concerned with guns, grazing, and getting the U.S. out of the United Nations"); Count My Vote, *Press Release: Utahns for Ethical Government Endorses Count My Vote*, http://www.countmyvoteutah.org/utahns-for-ethical-government-endorses-count- my-vote (last visited Feb. 21, 2018) (publicizing another group's endorsement, denigrating "caucuses" as "neighbor-inflicted litmus tests, to see if someone is sufficiently 'right-thinking' to be selected as a convention delegate in a problematic caucus voting process").

[21] Oral Argument at 25:00.

that [Senate Bill 54] was a compromise crafted between the Utah legislature and outside interests," namely, County My Vote. Maj. Op. at 5. Indeed, the bill's sponsor, Senator Bramble, opened his proposal by discussing Count My Vote's efforts to "increase citizen participation"— mentioning the group's appeals for the "dominant party" to change its convention rules.[22] Senator Bramble further explained that encouraging "competitive races between competing philosophies" would increase citizen participation.[23] It is likely, then, that Utah's purpose of "increasing voter participation" is linked to Count My Vote's goal of making party nominees more representative of Utahns as a whole.

This is not a legitimate way to increase voter participation. As the Court said in *Jones*, the desire to make a party's nominees more "representative" is "nothing more than a stark repudiation of freedom of political association: Parties should not be free to select their own nominees because those nominees, and the positions taken by those nominees, will not be congenial to the majority." 530

---

[22] Senate Day 24, 2014 53:00, http://le.utah.gov/jsp/jdisplay /billaudio.jsp?sess=2014GS&bill=sb0054&Headers=true (last visited Feb. 22, 2018).

[23] Senator Bramble also acknowledged that Count My Vote's proposed language had been incorporated into the bill. Senate Day 24, 2014 55:00–1:00:01, http://le.utah.gov/jsp/jdisplay/billaudio.jsp?sess=2014GS&bill=sb0054&Headers= true (last visited Feb. 22, 2018). He further described certain provisions as "consistent with the original intent of the Count My Vote proponents" and "consistent with the underpinnings" of the Count My Vote movement." *Id.* A number of other senators also mentioned Count My Vote and its purposes when discussing the purposes of the bill. *Id.* at 1:00:00-1:40:00.

U.S. at 582. If Utahns feel they are not represented by Republican Party office holders, they are free to vote for a different party.[24] But the solution for citizen indifference cannot be to destabilize an existing party in the hopes of galvanizing citizen attention. Nor can it be to force insurgent candidates upon the party, even if they are more representative of the median voter than the candidates the party would choose for itself. And after all, insurgency cuts both ways.

As for Utah's third interest—providing more ways for persons to become party candidates—it is similarly inadequate. This asserted interest is analogous to the state's claim in *Jones* that it had an important interest in allowing nonmembers to have a voice in a party's nomination. *Id.* at 583–84. The Supreme Court rejected that interest because a "nonmember's desire to participate in the party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications." *Id.* (quoting *Tashjian*, 479 U.S. at 215–216).

The same reasoning applies here. A party member's desire to become a candidate by means other than those the party has adopted is "overborne by the countervailing and legitimate right of the party to determine its own" candidate

---

[24] This is, in fact, already happening. *See* Lee Davidson, *New centrist party forms in Utah to attract disaffected Republicans, Democrats*, Salt Lake City Tribune (May, 24, 2017), http://archive.sltrib.com/article.php?id=5317869&itype=CMSID (noting that Republican and Democratic voters who feel disenfranchised have recently formed a new party in Utah).

33

nomination procedures. While the state may have an interest in making it easier for persons to earn a place as *unaffiliated* candidates on the general election ballot, it does not have a strong interest in making it easier for them to become *the party's candidates* on *the party's* primary ballot.[25]

The district court also considered a fourth possible state interest—that "[r]equiring a primary" allows the Lieutenant Governor to better perform his statutory duty to "'ensure compliance with state and federal election laws' more effectively than if nominee selection is left to a party-managed convention process." JA 1171 (quoting Utah Code Ann. § 20A-2-300.6 (2)(b)). Utah has not even mentioned this interest on appeal, perhaps acknowledging what little connection exists between preventing fraud and Senate Bill 54. Even if one accepts the district court's premise that primaries help prevent fraud, Senate Bill 54 does little to prevent fraud because it does not require a primary in every case:

---

[25] In deciding Utah has an interest in giving Party members "writ large" another way to gain the nomination, the majority paints party members as pitted against a separate (and even antagonistic) group of "party bosses." *See* Maj. Op. at 23, 25 n.15. Yet there is no reason to suppose a Great Wall between the two. Any Party member is free to become more involved in the Party's internal workings. If Party members want a signature-gathering route to nomination, they can surely rally for that change to the Party's bylaws, as is the case in many states. And as mentioned earlier, were a cabal to truly shut out the voices of ordinary members, members are free to quit, to form a new party, to cast their votes elsewhere. In the long run, there is more democratic accountability for political parties than the majority admits. The history of party presidential nomination processes demonstrates the adaptability of parties and their convention/delegate schemes.

34

when a qualified political party only has candidates who emerged from its convention, the law does not require the party to participate in a primary.

To summarize, then, Utah has not shown that its "interests make it necessary to burden the plaintiff's rights." *See Anderson*, 460 U.S. at 789. It has waved its hands at generalized interests, and that cannot be enough.[26]

### 4. Supreme Court Case Law

In spite of the state's failure to present a cogent theory of its interests in Senate Bill 54 and the extent to which the bill harms the Party's associational rights, the majority rests its decision on generalized dicta the Supreme Court has repeated, but never examined, since the 1970's. The Court has in fact never been asked to review a state provision squarely imposing a mandatory primary on recalcitrant political parties. Consequently, I respectfully think this reed cannot support the weight placed upon it.

The problem lies in its inception. In 1974, in *American Party of Texas v. White*, a case about alleged discrimination against minority parties—not mandatory primaries, the Supreme Court said: "It is too plain for argument, and it is not contested here, that the State may limit each political party to one candidate for each office on the ballot and may insist that intraparty competition be settled

---

[26] Though I have applied strict scrutiny, I think the foregoing shows Utah's interests do not meet the lesser "important interests" form of scrutiny either. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

before the general election by primary election or by party convention." 415 U.S. 767, 781 (1974). Since then, although the Supreme Court has never considered the question presented here, it has repeated variations of this dicta. *See New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008) (addressing challenge to New York's convention system for judicial offices). As recently as *Jones*, in which the Court held California's blanket primary unconstitutional, the Court repeated the mantra. 530 U.S. at 572. It did so even as the logic of its holding cast substantial doubt on the sufficiency of states' interest in mandating a primary over a political party's objection.

These statements suggest states can alter political parties' nomination processes *to some extent*. But while it is true we are "bound by Supreme Court dicta *almost* as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements," *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) (emphasis added), we generally do not follow dicta that has been completely assumed and unreasoned. *See Tokoph v. United States*, 774 F.3d 1300, 1303–04 (10th Cir. 2014), *as amended on reh'g* (Jan. 26, 2015) ("the 'dicta' do not appear to be of the considered sort that would compel us to reach the suggested conclusion"); *United States v. Bd. of Cty. Commissioners of Cty. of Otero*, 843 F.3d 1208, 1214 (10th Cir. 2016), *cert. denied sub nom. Bd. of Cty. Comm'rs of Otero Cty., New Mexico v. United States*, 138 S. Ct. 84 (2017) (following dicta because "each statement was *fully*

36

*considered*, went to the core of the issue under review, and was the explicit basis for the decision" (emphasis added)); *see also Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) ("For the reasons stated by Chief Justice Marshall . . . we are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.").

Even more significantly, as commentators have noted, an-anything-goes approach to primary election regulations is seriously at odds with the Supreme Court's internal logic in *Jones*. *See, e.g.*, Nathaniel Persily, *Toward a Functional Defense of Political Autonomy*, 76 N.Y.U. L. Rev. 750, 785 (2001) (explaining that *Jones* follows a long line of Supreme Court cases upholding party autonomy and "the reasoning in *Jones* would extend to all types of primary systems"); Richard L. Hasen, *"Too Plain for Argument?" The Uncertain Congressional Power to Require Parties to Choose Presidential Nominees Through Direct and Equal Primaries*, 102 Nw. U. L. Rev. 2009, 2010 (2008) (noting that "cases recognizing the parties' rights to overrule the states on the open or closed nature of political primaries" makes the status of this dicta "uncertain"). That is because one of the constitutional flaws identified in *Jones*—the alteration of the kinds of nominees a party chooses—is present in most primaries. *See* Samuel Issacharoff, *Private Parties with Public Purposes: Political Parties, Associational Freedoms, and Partisan Competition*, 101 Colum. L. Rev. 274, 274–275, 282; Pennings, *Democratizing Candidate Selection*, *supra*, at 269.

I therefore doubt the Supreme Court was laying down the law for all time in all contexts, including the intrusion mounted here by the state of Utah. At one time, perhaps, the necessity of primaries may have seemed obvious. Primaries were, as is well known, part of progressive reform to combat corruption-laced and "smoke-filled" backrooms, where party bosses supposedly ruled with autocratic quid pro quos. *See Lopez Torres*, 552 U.S. at 205–06; Diana Dwyre, *Political Parties and Campaign Finance: Challenges and Adaptations*, *in The Parties Respond: Changes in American Parties and Campaigns* 181, 185–86 (Mark D. Brewer & L. Sandy Maisel eds., 2013). Those were times when the party patronage system was strong, *see Elrod v. Burns*, 427 U.S. 347, 353 (1976) (describing this system), when parties more or less controlled candidates publicity, Diana Owen, *Political Parties and the Media: The Parties Respond to Technological Innovation*, *in The Parties Respond*, *supra*, at 237, 240, and when parties held the pocketbook, Dwyre, *supra*, at 181–185.

But that power is a gone-by era. The advent of the civil service system destroyed the party spoils system. *Elrod*, 427 U.S. at 353. From broadcast television in the mid-twentieth century to social media today, the changed media environment has wrested candidate publicity from parties' hands. Marc J. Hetherington & Bruce A. Larson, *Parties, Politics, and Public Policy in America* 102–104, 252 (11th ed. 2010). And parties have lost their grip on a candidate's cash. Dwyre, *supra*, at 206–07. As one commentator has put it, those "great

38

urban machines of generations past have practically disappeared."  Hetherington, *supra*, at 251.  And while the "classic functions" of parties "are recruitment, nomination, and campaigning . . . today's parties no longer dominate any of these activities."  *Id.* at 292.  Indeed, many of these functions have been farmed out to SuperPacs only loosely affiliated with political parties.  *See* Hetherington, *supra*, at 26, 37, 110, 136–37, 141.

At the same time, experience has called into question the Supreme Court's premise that primaries—the main democratizing device for nominations in use today—are "an ideal forum in which to resolve" intraparty "feuds."  *See Eu*, 489 U.S. at 227.  *See generally* Stephen E. Gottlieb, *Rebuilding the Right of Association: The Right to Hold a Convention as a Test Case*, 11 Hofstra L. Rev. 191 (1982) (arguing primaries can generate disorder and undermine First Amendment rights of parties).  Primaries tend to weaken party cohesiveness, alter a party's candidate mix, and change a party's political messages.  Pennings, *Democratizing Candidate Selection*, *supra*, at 269, 271; Hetherington, *supra*, at 250; Issacharoff, *Private Parties with Public Purposes*, *supra*, at 274.  Primaries have not, moreover, lived up to their hype of equalizing the playing field among candidates and increasing voter engagement.  Evidence suggests primaries do almost nothing to weaken incumbent advantage.  Hetherington, *supra*, at 79–80.  And as for increasing voter participation in the nomination process, primaries have been a dud.  Turnout for primary elections is consistently dismal.  *Id.*

39

This new context matters. The whole premise of the *Anderson*/*Burdick* test is to balance the associational burdens placed on political parties with a state's interest in maintaining "fair and honest" elections. *See Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). The much-reduced power parties wield in today's world suggests the burden of interference with their ability to nominate the candidate of their choice is greater and the state's interest in interfering is far lower than it was at an earlier time.

When circumstances have changed so drastically, it is not enough to rely on the fact that the Supreme Court once assumed the First Amendment balance clearly favored the state. In these as-applied challenges, we must evaluate the associational burden in light of facts on the ground. That is how we typically approach election law-related challenges and other First Amendment cases.

When aspiring candidates challenge the requirements they face to be listed on the ballot, for example, we do not look at whether a variant of that isolated provision was held constitutional in 1950, 1990, or even last year. Rather, "to assess realistically whether the law imposes excessively burdensome requirements . . . it is necessary to know other critical facts." *See Storer v. Brown*, 415 U.S. 724, 738 (1974). We thus look to whether the entire election mechanism, in its "totality," unduly impairs a person's ability to become a candidate. *Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375, 1379 (10th Cir. 1982). The Supreme Court has looked, for instance, to whether it is feasible, on the ground,

40

for candidates to collect the number of signatures a state requires for a place on the ballot. *See American Party of Tex. v. White*, 415 U.S. 767, 786–87 (1974) ("Given that time span, signatures would have to be obtained only at . . . four signatures per day for each 100 canvassers . . . Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization. Constitutional adjudication and common sense are not at war with each other . . . .").

Similarly, when evaluating time, place, and manner restrictions on speech, we do not focus solely on the prohibition at issue. We look at whether there are "ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Simply put, we assess how burdensome the regulation really is in the real world.

Consider the Supreme Court's explicit holding in a facial challenge to Indiana's voter identification law. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 185–89 (2008). The Court found that Indiana had sufficiently alleged state interests in ballot integrity that outweighed competing burdens on the right to vote. *Id.* at 191–97, 202–203. The Court held the "'precise interests' advanced by the State [were] therefore sufficient to defeat petitioners' facial challenge to" the law. *Id.* at 203. Yet despite this clear statement, when confronted with as-

applied challenges, lower courts have had no problem reassessing the severity of the burden on voters based on real world evidence.[27]  The same is true here.

And attention to facts on the ground is especially important when we are dealing with the associational rights of political parties.  Parties are an indispensable part of our democracy, having come into being almost immediately after the creation of the republic.  *Jones*, 530 U.S. at 574.  "Representative democracy in any populous unit of governance is unimaginable" without parties. *Id.*  Indeed, no large democracy has been able to operate without them.  Nicol C. Rae, *The Diminishing Oddness of American Political Parties*, *in The Parties Respond*, *supra*, at 25, 25.  Parties perform the essential task of aggregating disparate interests into digestible options on the ballot.  By doing so they provide an important heuristic for voters and reduce costs for legislators to organize around policies.  Persily, *The Legal Status of Political Parties*, *supra*, at 787.

---

[27] *See N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 214, 232 (4th Cir. 2016), *cert. denied sub nom. North Carolina v. N. Carolina State Conference of NAACP*, 137 S. Ct. 1399 (2017) (holding voter ID law unconstitutional in light of the record in that case); *Veasey v. Perry*, 71 F. Supp. 3d 627, 679, 707 (S.D. Tex. 2014), *vacated in part on other grounds*, *Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *on reh'g en banc*, 830 F.3d 216 (5th Cir. 2016), *and aff'd in part, vacated in part, rev'd in part sub nom. Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (holding voter ID law unconstitutional because there were "substantial differences in the evidentiary record" making *Crawford*'s holding inapplicable); *Frank v. Walker*, 17 F. Supp. 3d 837, 845, 863 (E.D. Wis.), *rev'd*, 768 F.3d 744 (7th Cir. 2014) (the district court held voter ID law unconstitutional because the record was different from that in *Crawford* but was reversed on the grounds that the record in *Crawford* was too similar).

And by brokering between the varied interests in the coalition, parties make it possible for a large number of interests—especially minorities—to have a voice. *See id.*

As Justice O'Connor explained in her concurrence in *Davis v. Bandemer*, "[t]here can be little doubt that the emergence of a strong and stable two-party system in this country has contributed enormously to sound and effective government." 478 U.S. 109, 144–45 (1986). "The preservation and health of our political institutions, state and federal, depends to no small extent on the continued vitality of our two-party system, which permits both stability and measured change." *Id.*

In light of the important function political parties serve in our Republic, we should be wary of burdens on their associational rights at a time when they are, in many respects, already weakening. In most states, it is true, the major political parties still favor the primary election. Persily, *Toward a Functional Defense of Political Autonomy*, *supra*, at 786. But the case for the constitutionality of *forcing* political parties to engage in selection-by-primary against their will is, today, far more suspect. Indeed, mandatory primaries are anomalous among the world's democracies, and have not, despite the oft-repeated myth, resulted in what most reformers intended.[28] Under these circumstances, we should not rely

---

[28] *See* Richard Pildes, *Two Myths About the Unruly American Primary System*, Washington Post (May 25, 2016),

43

on conclusory assertions.  If we permit the kind of associational degradation

Senate Bill 54 effects on parties, we may find instead of "stability," populism,

and instead of "measured change," extremism.

I would therefore hold Senate Bill 54's primary provisions unconstitutional.

## C.  *The Signature-Gathering Provision*

The Utah Republican Party also claims the number of signatures Senate Bill

54 requires qualified political party members to collect to become candidates for

the State House or Senate are unconstitutionally burdensome.  Because the

majority holds the rest of Senate Bill 54 is constitutional, it also decides this

question.  I agree with the majority that, if the rest of the scheme is constitutional,

the quantities of signatures required are not unconstitutional.

The Utah Republican Party argues the percentage of eligible signers a

candidate must obtain signatures from for State House and Senate far exceeds the

five-percent "safe harbor" under *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

*See also Storer*, 415 U.S. at 739.  The number of signatures required—1,000 for

State House, 2,000 for State Senate—range from 6% to 57% of the eligible

signers in each district.[29]

_____

https://www.washingtonpost.com/news/monkey-cage/wp/2016/05/25/two-myths-about-the-unruly-american-primary-system/?utm_term=.b06a00d53dc6.

[29]  These high figures are the result of the first lawsuit.  Senate Bill 54 used to allow unaffiliated voters to sign candidacy petitions.  When the district court held that provision unconstitutional, the Utah Republican Party chose only to allow its own members to sign petitions, drastically reducing the number of

But these percentages are not the end of our analysis.  The Supreme Court's "ballot access cases . . . focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process." *Clements v. Fashing*, 457 U.S. 957, 964 (1982).  "The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." *Id.* (internal quotation marks and citation omitted).

Accordingly, we look at the "the practical effect of the election laws of a given state, viewed in their totality." *Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375, 1379 (10th Cir. 1982).  This "totality" approach is in agreement with the Second Circuit's approach in *LaRouche v. Kezer*, 990 F.2d 36 (2d Cir. 1993).  When there is a constitutional method of becoming a candidate on the ballot, an additional method—even if difficult to use—is not unconstitutional unless it is irrational.  *See id.* at 38–39 & n.1.

Senate Bill 54 provides two paths for a qualified political party member to obtain a place on the primary ballot.  One is the party convention.  The other is signature-gathering.  Because all agree that the convention method is constitutional on its own, the signature-gathering route only increases the ways a

---

eligible signers in each district.  This does not affect the outcome one way or the other.  *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 187 (1979) ("Historical accident, without more, cannot constitute a compelling state interest.").

45

candidate can earn a slot on the ballot.  Accordingly, even if it is difficult to use, it does not unfairly burden political opportunity.

Contrary to the Utah Republican Party's contention, there is also no indication that the numbers chosen are irrational.  The state might think that one or two thousand supporters is in itself a "significant modicum of support" meriting a candidate's placement on the ballot, regardless of the percentage of eligible signers it represents.  *See Jenness*, 403 U.S. at 442.  Or the state may want to incentivize use of the party convention for State House and Senate candidacies.  Either way, the signature-gathering requirements do not violate the Constitution.[30]

## III.  Conclusion

Senate Bill 54 attempts to change the substance of the Utah Republican Party under the guise of the state's authority to regulate electoral procedure.  Like California in *Jones*, Utah had the "intended outcome" of "changing the [Party's] message" and "favor[ing] nominees with 'moderate' positions."  *See Jones*, 530 U.S. at 580–82.  There is "no heavier burden on a political party's associational freedom."  *Id.*

---

[30]  The foregoing analysis does not, however, foreclose an as-applied equal protection or due process challenge by an aspiring candidate disadvantaged by these signature-gathering requirements.

In contrast to these heavy burdens, the State's asserted interests are vague and even impermissible. Utah alleged no evidence of corruption or fraud. And this is not a case in which the Party has disenfranchised some protected segment of the citizenry in its processes. *See, e.g.*, *Smith v. Allwright*, 321 U.S. 649, 650 (1944). To the contrary, the Party uses a convention system that gathers delegates from around the state who are chosen at caucus meetings open to all of the public without any qualification other than Party membership.

The background of this case should caution us as to the perils of allowing states to impose procedural changes of this magnitude on unwilling political parties. After the Utah Republican Party repeatedly rebuffed requests to change its nomination procedures, the unsuccessful reformers simply went to the state legislature and changed the Party's procedures by force of law. Allowing this collateral attack on party rules to be a run-of-the-mill part of the political process invites leaders "to enlist and rely on state law as the primary vehicle for party governance, largely relieving these leaders of any need to secure the support or acquiescence of party members to a chosen course." *See* Ellen D. Katz, *Barack Obama, Margarita Lopez Torres, and the Path to Nomination*, 8 Election L. J. 369, 379 (2009).

Perhaps it would be wise for the Utah Republican Party to change its nomination procedures. And maybe it will. Parties are not impervious to change. Change happens to parties constantly, sometimes from within and sometimes from

47

without. But such change is not for legislatures to impose. At least not unless they have clearly spelled out, compelling interests.

For the foregoing reasons, I respectfully dissent with respect to the Either or Both and mandatory primary scheme and concur with respect to the signature-gathering provision.